**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 20 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

SHERWIN SEAMONS and JANE SEAMONS, individually and as natural parents of BRIAN SEAMONS, a minor,

      Plaintiffs-Appellants,

v.

DOUGLAS SNOW, individually and in his capacity as the Coach at Sky View High School, and agent of Sky View High School and the Cache County School District; MYRON BENSON, individually, and as Principal of Sky View High School, and agent of Sky View High School and the Cache County School District; SKY VIEW HIGH SCHOOL; THE CACHE COUNTY SCHOOL DISTRICT,

      Defendants-Appellees,

No. 98-4152
98-4155

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 94-CV-4-B)

---

Submitted on the Briefs:

Robert R. Wallace and Lisa Watts Baskin of Plant, Wallace, Christensen & Kanell, Salt Lake City, Utah, for Plaintiffs-Appellants.

Jan Graham, Attorney General; and Brent A. Burnett, Barbara E. Ochoa and Dan R. Larsen, Assistant Attorneys General, State of Utah, Salt Lake City, Utah, for Defendants-Appellees.

Before **SEYMOUR**, Chief Judge, **BRISCOE** and **MURPHY**, Circuit Judges.

**SEYMOUR**, Chief Judge.

This case arises out of the locker-room assault of a high school football player, Brian Seamons, by several of his teammates. Brian filed this action under 42 U.S.C. § 1983 against the school's football coach and principal, as well as the school district. He argues his rights under the Free Speech Clause of the First Amendment were violated when he was suspended and later dismissed from the football team because he refused to apologize for reporting the assault to the police and school authorities. The district court granted summary judgment in favor of all defendants. Brian appeals. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I

In the fall of 1993, Brian Seamons was a student at Sky View High School in Smithfield, Utah, and a member of the school's football team. On Monday, October 11 of that year, Brian was assaulted in the locker room by a group of his teammates. As Brian emerged from the showers, four teammates grabbed him, forcibly restrained him, and then bound him to a towel rack with highly adhesive

athletic tape. Another teammate brought a girl Brian had dated into the locker room so that she could see what had been done to him.

Brian and his parents reported this incident to the police and to school authorities, including Myron Benson, Sky View's principal, and Doug Snow, the football coach. Two days after the assault, Brian and his parents met with Principal Benson and Coach Snow to discuss whether Brian would press criminal charges against the team members who assaulted him and whether Coach Snow would take any disciplinary action against them. Coach Snow stated he did not plan to remove any of the assailants from the team. Brian indicated that, in light of this, he would need to think about whether he wanted to remain on the team.

On Friday, October 15, the football team was scheduled to play an away game at Logan High School. That afternoon Brian informed Coach Snow that he wanted to remain on the team, and the two attended the traditional pre-game team-only spaghetti dinner in the school cafeteria. Coach Snow told Principal Benson that Brian was back on the team and everything had been worked out. In the meantime, Brian went home to get his uniform so he could dress for the game. When he returned to the school, Coach Snow asked Brian to meet with the four team captains, two of whom had participated in the assault. The purpose of this meeting, at which the Coach was present, was to allow the boys to clear up any residual hard feelings prior to the game.

During this meeting, a confrontation occurred between Brian and Dan Ward, a captain who had also been one of the assailants, over whether Brian should have to apologize to the team for reporting the assault to the police and school authorities. Specifically, Dan stated that he thought Brian had "betrayed the team" by reporting the assault and that Brian should not be allowed to play with the team until he apologized. Aplt. App., tab 14 at 376, 379. At this point, Coach Snow intervened and told Brian he needed to "forgive and forget and apologize" to the team captains. *Id.* at 359. When Brian refused, Coach Snow told him to "take the weekend and think about this," because without an apology he couldn't play with the team. *Id.* at 326. This ended the meeting.

Brian did not play in the game that night. He went home and told his parents he wasn't allowed to play because he had refused to apologize to the team. Brian's father, Sherwin Seamons, called the principal and angrily told him what had transpired at the meeting. Principal Benson, surprised to hear that Brian wasn't going to attend the game, drove to Logan High School and discussed the matter with Coach Snow.

The following Tuesday, Brian confronted Coach Snow in school, telling him he wasn't going to apologize to the team and he still wanted to play football. At this point, Coach Snow told Brian that he was "sick of [his] attitude, sick of [his] father's attitude," and that he was off of the team. Aplt. App., tab 15 at 432-

33. The following day the remainder of Sky View's football season was canceled.

## II

Brian and his parents filed suit against Coach Snow, Principal Benson, Sky View High School, and the Cache County School District. Brian alleged numerous bases for recovery, including violation of his rights under Title IX and violations of his constitutional rights to procedural due process, substantive due process, freedom of association, freedom of speech, and equal protection. The district court granted defendants' motion to dismiss all of Brian's claims. *See Seamons v. Snow*, 864 F. Supp. 1111 (D. Utah, 1994) (*Seamons I*).

Brian appealed to this court. We affirmed the district court's dismissal of all but the free speech claim, holding that Brian had properly stated a claim under the First Amendment and that the district court's dismissal had been premature. *See Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996) (*Seamons II*). We remanded to the district court for further proceedings.

The parties engaged in full discovery and deposed all the principal witnesses. Defendants moved for summary judgment and the district court held a summary judgment hearing. Then, in an unusual procedure, the court *sua sponte* held an evidentiary hearing at which five witnesses testified. Subsequently, the court granted summary judgment for defendants, and held alternatively that the

-5-

school officials were entitled to qualified immunity. *See Seamons v. Snow*, 15 F. Supp. 2d 1150 (D. Utah 1998) (*Seamons III)*. Brian appeals these rulings.

**III**

We begin with a discussion of the unusual procedure the district court employed in conducting an evidentiary hearing on the summary judgment motion. Stating that it "needed to know more about the facts" after the initial summary judgment hearing, Aplt. App., tab 14 at 317, the court asked each of the parties to present live witness testimony at an evidentiary hearing. Neither party had requested this hearing. Five witnesses, two for plaintiffs and three for defendants, testified, were cross-examined, and were questioned by the court.

Rule 56 is silent as to whether oral testimony can be introduced at a summary judgment hearing, although it seems to suggest that decisions be based on affidavits and documentary evidence. *See* FED. R. CIV. P. 56(c) ("pleadings, depositions, answers to interrogatories, . . . admissions on file, . . . [and] affidavits" are properly considered at summary judgment). Rule 43, however, authorizes the use of oral testimony for motions generally. *See* FED R. CIV. P. 43(e) ("When a motion is based on facts not appearing of record the court may hear the matter on affidavits. . . [or] the court may direct that the matter be heard wholly or partly on oral testimony or deposition."). Other courts have applied

Rule 43 to motions for summary judgment. *See* 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2723 at 386 (3d ed. 1998) (citing cases); *see also Utah Div. of Parks & Rec. v. Marsh*, 740 F.2d 799, 802 n.2 (10th Cir. 1984) (citing authorities and noting lack of objection).

The Seventh Circuit has observed that oral testimony is an appropriate procedure for those kinds of motions which permit the court to resolve factual disputes, which a summary judgment motion does not:

> A judge decides many motions. A motion to dismiss for want of jurisdiction is decided by the court alone. So, too, with motions to quash subpoenas and motions for new trials, two among the many for which Rule 43(e) was designed. A court may choose among methods for gathering the evidence, when it will resolve all factual disputes. Rule 43(e) gives the judge the full menu – oral testimony, depositions, affidavits, and documents. He may use the one best suited to the occasion. A judge hearing a motion for summary judgment has no similar right to decide which evidentiary materials are the best ones for resolving a disputed question of fact; the judge may not resolve the dispute at all. *The power to select among kinds of evidence does not imply a power to resolve disputed questions of fact.*

*Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir. 1986) (citations omitted) (emphasis added). Because of the nature of summary judgment motions, the taking of oral testimony poses problems:

> [O]ral testimony also could waste a lot of everyone's time. Because the judge may not evaluate the credibility of the witnesses, the principal advantage of oral testimony is unavailable in hearings under Rule 43(e) on motions for summary judgment. If there is no disputed issue, a few affidavits should show that. . . . [O]ral testimony under Rule 43(e) will be redundant. Because the judge may not resolve evidentiary disputes, he will do the same thing after hearing the testimony he should have done after

reading the affidavits; if the judge denies the motion the same witnesses will need to reappear for the trial, and if he grants the motion the witnesses did not need to appear at all. Either way the witnesses appear too many times. The litigants, their counsel, the witnesses, and the judge all will be the worse for the experience. One trial per case is enough. Rule 43(e) hearings on motions for summary judgment therefore should be rare.

*Id.* at 628-29. *See also Thompson v. Mahre*, 110 F.3d 716, 720 (9th Cir. 1997) ("[T]he taking of oral testimony on summary judgment is [probably] so rare [because] it would ordinarily be a waste of time.").

While the district court here *could* use oral testimony at the summary judgment stage, the question remains whether it *should* have. We agree with those courts that have suggested oral testimony on summary judgment motions should be used sparingly and with great care. The purpose of summary judgment, which is to provide quick resolution when there are no disputed issues of fact, would be compromised if the hearing permitted by Rule 43(e) became a preliminary trial.[1] *See, e.g., MacLean v. Parkwood, Inc.* 247 F. Supp. 188

---

[1] A summary judgment hearing is to be distinguished from a "single-issue trial" which courts may hold, under limited circumstances, pursuant to Rule 42(b). Such an abbreviated trial may resemble a summary judgment proceeding because it deals with a dispositive issue which is often separate from the case's merits. *See Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 327 (7th Cir. 1993). An evidentiary hearing on a motion for summary judgment is clearly not such a situation. Moreover, Rule 42(b) requires that the parties' right to trial by jury be "preserv[ed] inviolate." In the present case, both parties requested and were entitled to a jury trial. The court could not assume a fact-finding role and usurp the power of the jury. *See Stewart*, 790 F.2d at 629-30 (finding that, because the plaintiff's time for demanding a jury trial had not yet

(continued...)

(D.N.H. 1965); 10A Federal Practice & Procedure § 2723 at 387 (3d ed. 1998).

Moreover, oral testimony at the summary judgment stage creates a strong temptation for a judge to assess the witness' credibility. It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir. 1992) (quoting *Anderson*). This follows from the fact that the court may grant the motion only if there is "no genuine issue as to any material fact." FED. R. CIV. P. 56(c).

In the present case, the district court had ample documentary evidence at its disposal. Both parties had completed discovery and the five witnesses who testified at the evidentiary hearing had already been deposed. Given this, it is unclear to us why the district court felt the need to convene the extraordinary evidentiary hearing which may have led it to grant summary judgment in the face of disputed fact issues, a matter to which we now turn.

**IV**

We review the entire record on summary judgement de novo in the light

---

[1](...continued)
expired, the "district judge was not–not yet, anyway–the finder of fact entitled to segment the issues and hold a limited trial").

most favorable to the party opposing summary judgment. *See Weir v. Anaconda Co.*, 773 F.2d 1073, 1079 (10th Cir. 1985). We must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *See Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476 (10th Cir. 1990). "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Luckett v. Bethlehem Steel*, 618 F.2d 1373, 1377 (10th Cir. 1980) (citations omitted). Finally, if the district court made any findings of fact, they are not entitled to the deference due findings of fact made after a trial on disputed factual issues. *See Riley*, 896 F.2d at 476-77 & n.5 (determinations made in ruling on summary judgment are not reviewable under the clearly erroneous standard of Rule 52(a), but are reviewed under Rule 56(c) to ascertain whether there is an absence of any genuine issue of material fact).

## A. First Amendment Claim

In ruling on the motion for summary judgment, the district court determined that Coach Snow did not ask Brian to apologize for reporting the assault, and that Brian's ultimate failure to be involved with the football team was unrelated to his speech or refusal to speak. *See Seamons III*, 15 F. Supp. 2d at 1155, 1157. Given the conflicting testimony presented at the evidentiary hearing and contained in the depositions, we fail to see how the district court could reach these conclusions

without resolving factual disputes – something it cannot do at this stage of the proceedings. *See, e.g., MacLean*, 247 F. Supp. at 190 ("The Court's role in summary judgment proceedings is not to resolve issues of fact, but merely to pinpoint those facts which are not at issue."). We note in particular that the district court devoted a large portion of its opinion to a discussion of the differing accounts of the captains' meeting offered by Brian, Coach Snow, and Dan Ward during the evidentiary hearing. *See Seamons III*, 15 F. Supp. 2d at 1156-57.

The district court indicated at the evidentiary hearing that it needed to examine three issues before it could determine whether there were sufficient facts to support a free speech claim: (1) whether Coach Snow asked Brian to apologize to the team captains; (2) the intended scope of this alleged apology; and (3) if there was such a request for an apology, whether Brian's failure to apologize was a significant factor in his dismissal from the team. We address these issues in turn, taking the evidence in the light most favorable to Brian, the non-moving party.

### 1. Whether Coach Snow asked Brian to apologize to the team captains

The district court found that Brian was not asked to apologize for reporting the hazing incident. In his deposition and at the evidentiary hearing, Brian testified to the following: during the captains' meeting Dan Ward told him he had

betrayed the team by reporting the assault and demanded an apology; when Brian refused, Coach Snow said he would need to "forgive and forget and apologize" in order to remain playing on the team; Coach Snow further stated, "we would need an apology before we let you back on the team." Coach Snow admits to making statements of this nature, although he denies ever directly telling Brian to apologize. If we credit Brian's version, and we must at this stage, there is clearly a disputed issue of fact as to whether Coach Snow asked Brian to apologize to the team captains.

### 2. The intended scope of this apology

The district court found that, even if Coach Snow used the word "apologize," he was not asking Brian to apologize for reporting the assault. Instead, the court concluded that "[t]he request for an 'apology' was not a demand, or a request, for Brian to say he was wrong for reporting the hazing incident; it was rather a request for a mutual reconciliation among Brian and his teammates to allow the boys to function together as friends and teammates." *Seamons III*, 15 F. Supp. 2d at 1157. Brian testified that Coach Snow's statements regarding the apology came in response to a heated discussion between Brian and Dan Ward, wherein Dan insisted that Brian not be allowed to play unless he apologized for reporting the assault. Coach Snow interrupted the

-12-

exchange and expressed his desire that Brian apologize in order to remain on the team. Coach Snow further stated that the team would need an apology before Brian could return. When these remarks are taken in context, it is reasonable to infer that Coach Snow was telling Brian he could not return to the team unless he apologized for reporting the assault. In any event, that is how Brian interpreted the statement, and a jury could properly do the same. Thus, the intended scope of the apology is also a matter of dispute.

One difficulty presented here is the fact that the scope of the requested apology is dependent in part on Coach Snow's intent in asking for it. The Coach's purpose in making these statements to Brian is not easily ascertained and requires inferences drawn from the Coach's behavior throughout the meeting and the broader controversy. This is precisely why summary judgment is not appropriate at this stage. *See, e.g., Hayden v. First Nat'l Bank*, 595 F.2d 994, 997 (5th Cir. 1979) (In "cases which involve delving into the state of mind of a party, [the] granting of summary judgment is especially questionable."). "If plaintiffs claim that some conduct on the part of defendant abridged their First Amendment rights, summary judgment may be precluded because questions concerning defendant's motives or knowledge must be determined." 10B C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2732.2 at 153-54, 177 (3d ed.

1998).[2]

### 3. Whether Brian's failure to apologize was a significant factor in his dismissal from the team

The district court found that Brian had failed to produce facts showing a "legal causal connection between his speech and his ultimate failure to be involved with the football team." *Seamons III*, 15 F. Supp. 2d at 1155. We disagree. There are ample facts in the record to indicate that Brian's suspension and dismissal from the football team were directly related to his failure to apologize for reporting the assault.

Brian testified that when Coach Snow told him to "take the weekend and think about it," he understood he was being told not to participate in that night's game. Aplt. App., tab 14 at 337, 350-52. Coach Snow testified that by making this statement he was telling Brian he couldn't participate in that night's game. *Id.* at 402, 405. Presumably, had Brian offered the apology at the captains' meeting he would have been allowed to suit up for the game. He was at school and ready to play on Friday. There was no indication that he didn't want to play or would be prevented from playing in the Logan game. The only thing that

---

[2] We point out that cases involving constitutional or civil rights "frequently are unsuitable for summary judgment" because "a necessary element of the claim for relief presents an inquiry into the state of mind of one or more of the parties." *See id.* at 152.

happened to alter this situation was the captains' meeting at which Brian was asked, and refused, to apologize. Thus, there is evidence that Brian's refusal to apologize was directly related to the fact that he couldn't play in the Friday game, which was, in effect, a temporary suspension from the team.

A few days later when Brian told Coach Snow he was not going to apologize, he did not think he needed to apologize, and he still wanted to play football, Coach Snow stated that he was "sick of [his] attitude" and took him off the team for good. Aplt. App., tab 15 at 472. It can clearly be inferred that this final confrontation, which resulted in Brian's dismissal from the team, was a product of Brian's refusal to apologize.[3]

In summary, there are genuine issues of material fact as to whether Coach Snow required Brian to apologize as a condition of remaining on the team. There is a disputed question as to the scope of the apology Coach Snow asked Brian to give. Finally, there is an issue as to whether Brian's suspension and dismissal from the team were the result of his refusal to apologize. Considering all of the facts and drawing all inferences in the light most favorable to Brian, we conclude there is evidence to support his First Amendment claim against Coach Snow.

---

[3] Defendants argue that Coach Snow did not remove Brian from the team because parental consent for Brian to play had already been withdrawn by his father during the heated telephone conversation he had with Principal Benson. Brian's father, Sherwin Seamons, denies withdrawing consent.

The district court did not separately analyze Brian's First Amendment claims against the school district and Principal Benson. The school district, as a quasi-municipal agency, can be sued for monetary, declaratory, or injunctive relief for depriving someone of constitutional or civil rights. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978). Qualified immunity is not available as a defense to municipal liability. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980). A municipality cannot, however, be held liable for the actions of its employees under the theory of respondeat superior. *See Monell*, 436 U.S. at 691. Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-83 (plurality opinion) (1986); *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1248-49 (10th Cir. 1999).

In this case, the record indicates that Coach Snow, and only Coach Snow, was vested by the school district with the authority to make final decisions regarding membership on the Sky View football team. Aplt. App., tab 18 at 434, 436, 492. Because of this delegation of authority, the school district can be held liable for Coach Snow's actions on team membership. *See Pembaur*, 475 U.S. at 483 ("Authority to make municipal policy . . . may be delegated by an official

who possesses such authority . . . .").

Liability with respect to Principal Benson is more complicated. He was involved in the controversy surrounding the assault, attending meetings and discussing the issues with the Seamons family, school district representatives, and Coach Snow. However, the record does not indicate that Principal Benson himself took any actions which led to Brian's suspension or dismissal from the team. Moreover, there is no indication in the record that Principal Benson was vested with the same powers given Coach Snow with respect to determining the players on the team.

Nor does the record indicate that Principal Benson had any prior knowledge of or control over Coach Snow's actions with respect to Brian. In fact, it indicates the contrary. Prior to the captains' meeting, Coach Snow stopped by Principal Benson's office and told him everything had been resolved and that Brian was back with the team. Principal Benson was unaware of any problems until Brian's father called him later that evening, after the Logan game had begun. In addition, Principal Benson was unaware of the Tuesday confrontation between Brian and Coach Snow, which resulted in Brian's dismissal from the team, until after it had occurred.

There being no evidence that Principal Benson had prior knowledge of or involvement in the events that led to Brian's suspension and dismissal from the

team, he was properly dismissed as a defendant in this lawsuit.

**B. Qualified Immunity**

The district court alternatively found that even if the evidence supported a First Amendment claim, defendant officials were entitled to qualified immunity because "Brian has failed to show *any law* sufficiently well established in 1993 to support the proposition" that under the circumstances of the case he is entitled to relief. *Seamons III*, 15 F. Supp. 2d at 1159 (emphasis added). "We review the district court's grant of summary judgment based on qualified immunity de novo, applying the same standard used by the district court." *Roberts v. Kling*, 144 F.3d 710, 711 (10th Cir. 1998) (per curiam) (citation omitted).

When the case was last before us, we held that Brian's complaint stated a claim that defendants violated clearly established law and that they therefore were not entitled to qualified immunity. *See Seamons II*, 84 F.3d at 1238-39. We went on to note that defendants could reassert their entitlement to qualified immunity at summary judgment, but only if "Brian's allegations in the complaint prove to be unfounded." *Id.* at 1238. The district court's conclusion that the law was not clear in 1993 is inconsistent with our mandate and relevant case law.

As we noted in our previous opinion, *see Seamons II*, 84 F.3d at 1237-38, extensive case law in 1993 supported the proposition that school authorities may

not penalize students for their speech when that speech is non-disruptive, non-obscene, and not school-sponsored. *See, e.g. Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 508-09 (1969) (school authorities cannot punish students for exercising their freedom of expression where speech does not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or intrude on the rights of other students; "undifferentiated fear or apprehension of disturbance" is not enough to overcome the right to freedom of expression). *Cf. Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (school authorities can exercise greater control over students' speech when it involves "school-sponsored expressive activities"); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (school authorities could penalize student for lewd and indecent speech).[4]

Moreover, in a case factually similar to the one at bar, a district court in this circuit had denied a defendant's motion for summary judgment on this very question. In *Hysaw v. Washburn Univ. of Topeka*, 690 F. Supp. 940 (D. Kan. 1987), black football players boycotted practice to protest discrimination. Their

---

[4] Relying on *Connick v. Myers*, 461 U.S. 138 (1983), and ignoring the well-established Supreme Court authority set out above and discussed by this court in its previous opinion, the district court attempted to analogize the circumstances here to First Amendment cases involving public employees. *See Seamons III*, 15 F. Supp. 2d at 1158. Defendants wisely do not pursue this line of argument on appeal.

coach refused to let them remain on the team unless they apologized to the school and to the team. The court found that summary judgment for the coach on the First Amendment issue was inappropriate. *See id.* at 946. Other cases involving student athletics had indicated prior to the incident here that coaches may not penalize players for engaging in peaceful speech activity which does not create substantial disorder, materially disrupt class work, or invade the rights of others. *See Williams v. Eaton*, 443 F.3d 422 (10th Cir. 1971) (denying summary judgment to coach who suspended black players because they wanted to wear protest armbands during game); *Boyd v. Board of Dir.,* 612 F. Supp. 86 (E.D. Ark. 1985) (coach held liable for suspending black players after a peaceful protest and boycott of pep rally and game). Thus, Coach Snow cannot claim qualified immunity based on a lack of clear law in 1993.[5]

Coach Snow was the person most directly involved with Brian's suspension and dismissal from the football team. It was his responsibility to determine who played on the team and to make disciplinary decisions. He orchestrated the captains' meeting, instructed Brian not to attend the Logan game when Brian refused to apologize, and arguably dismissed Brian from the team when Brian again expressed an unwillingness to apologize. "[A] reasonably competent public

---

[5] We have already held that Principal Benson was properly dismissed because there is no evidence tying him in any meaningful way to Brian's claimed injury.

official should know the law governing his conduct." *Chapman v. Nichols*, 989 F.2d 393, 397 (10th Cir. 1993) (quotation omitted).  A "precise factual correlation between the then-existing law and the case at-hand is not required." *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992) (quotation omitted).  Coach Snow is not entitled to qualified immunity for his actions with respect to Brian's suspension and removal from the Sky View football team.

## V.

In the proceedings below, the district court expressed a belief that this case had gone on for too long, spawned an inordinate amount of controversy, and was not significant enough to warrant time in the federal courts.  While this sentiment by a busy judge may be understandable, it cannot justify summary disposition in the face of genuine issues of material fact.  Moreover, the use of live testimony at the evidentiary hearing was unorthodox and unnecessary and itself prolonged the proceedings.  Brian has asked for his day in court.  Because he meets the requirements for stating a claim and alleging material facts in dispute, he is entitled to a trial.

The judgment of the district court is **REVERSED** with respect to defendants Douglas Snow and the Cache County School District, and the case is **REMANDED** for further proceedings consistent with this opinion.  The judgment

-21-

with respect to Defendant Myron Benson is **AFFIRMED**.