NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0143n.06
Filed: February 23, 2005

**Nos. 03-6655, 04-5058**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ERIN MESSING, as executrix of the estate of )
Andrew Messing, )
                                 )
      Plaintiff-Appellee/Cross-Appellant, )
                                 )   ON APPEAL FROM THE UNITED
v.                                      )   STATES DISTRICT COURT FOR THE
                                 )   EASTERN DISTRICT OF KENTUCKY
C. LESTER PAUL, et al., )
                                 )
      Defendants-Appellants/Cross- )
Appellees. )

Before: NELSON and SUTTON, Circuit Judges; WELLS, District Judge.[*]

SUTTON, Circuit Judge. Over the course of several years, Andrew Messing agreed to lend $600,000 to myriad oil-and-gas ventures owned by Lester Paul and his family (collectively, "the Pauls"). After the Pauls failed to pay him, Messing brought (and after his death in February of 2001, Erin Messing, his wife and the executrix of his estate, continued) this lawsuit to recover the $600,000. In turn, the Pauls sought to hold Messing liable for an alleged breach of a stock-option agreement and for damages allegedly resulting from their investments in and work for a Florida partnership named Gasbusters, Inc. The district court held that Messing could recover the $600,000

---

[*]The Honorable Lesley Wells, United States District Judge for the Northern District of Ohio, sitting by designation.

loan, that the stock-option agreement never ripened and that the Pauls could not recover any damages Gasbusters owed them from Messing, who, as a limited partner in the company, was not directly liable for its debts. We agree with the district court's order in all respects but one—we agree with Messing that Michael Paul, Lester Paul's son, is personally liable under the relevant agreements for signing them as the president of a dissolved corporation.

I.

Lester and Margaret Paul and their sons, Michael and Timothy Paul, own several Kentucky oil-and-gas businesses. Among their corporations and their assumed business names are T & P Enterprises, Delstar Resources (a Nevada corporation), Delstar Resources (a Kentucky corporation), The Viking Group, Bluegrass Drilling Corporation and Delta Gas Corporation (collectively, "the Paul entities"). Some of these companies, on the Pauls' own admission, had been dissolved at all times relevant to this appeal, *see* JA 77 (admitting that Delstar Resources (Kentucky) was administratively dissolved on November 3, 1997, and that Bluegrass Drilling Corporation was dissolved on November 1, 1994), and others have never existed at all as independent entities, *see* JA 78 (admitting that The Viking Group "is an assumed name").

On November 25, 1997, Lester Paul, acting as a "spokesperson" for the Paul entities, negotiated a $500,000 loan from Andrew Messing that would become due along with interest on November 30, 1998, in one balloon payment. In exchange, the Pauls gave Messing a promissory note and an agreement pledging all of the stock in their corporations as security for Messing's loan.

Lester and Margaret Paul signed these agreements in their corporate and individual capacities, and Michael Paul signed them in his capacity as president of the then-non-existent corporation, Delstar Resources (Kentucky). Over the next year and a half, Messing agreed to increase the value of the loan by an additional $100,000 in exchange for two additional promissory notes and a mortgage on Paul-held real estate.

Also on November 25, 1997, as part of the same transaction, Messing entered into a stock-option agreement with the Pauls that allowed him to convert his loan to the Pauls into a one-half equity interest in the Paul entities. Under the agreement, Messing had an option to purchase fifty percent of the "stock" of Delstar Resources (Nevada), Delstar Resources (Kentucky), Bluegrass Drilling, Delta Gas and The Viking Group for $500,000. "[I]n the event that [Messing] elect[ed] to exercise his option to purchase and pay for the shares," the agreement provided, his "obligations . . . [were] subject to the satisfaction of" several conditions. JA 370. The Pauls, for example, agreed to "perform[] and compl[y] with all covenants, conditions, and obligations required by this agreement to be performed or complied with prior to or on the closing." JA 370. And they represented and warrantied that the corporations were "duly organized, validly existing, and in good standing under the laws of the Commonwealth of Kentucky or the State of Georgia respectively"—a representation that the Pauls now concede to have been false. JA 367. The contract established a deadline of May 31, 1998, for Messing to decide whether to convert his previous loan into a capital contribution. If Messing chose to go through with the conversion, the agreement "contemplated" that a "closing . . . shall take place at the offices of" a Kentucky law firm on a date set by Messing

- 3 -

"within 20 business days after the exercise . . . of the option to purchase the shares and satisfaction or waiver of all of the conditions." JA 367.

On May 21, 1998, Messing's attorney notified Lester Paul that Messing intended to exercise his rights under the stock-option agreement to become a one-half owner of the Paul entities. But because the dates suggested by Messing's attorney conflicted with Lester Paul's schedule, the parties never met for the "closing" that the stock-option agreement contemplated. Paul repeatedly extended the deadline for scheduling a closing but the deal was never consummated. And in November of 1999, Messing indicated that he did not wish to close on the stock-option agreement.

Over roughly the same period of time as these events, the Pauls began to invest in and work for a Florida limited partnership named Gasbusters, in which Messing was a partner. One of the Paul entities, Delstar Resources (the Nevada version), acquired from Delstar (Kentucky) in May of 2000 the title to land containing oil-and-gas minerals that Gasbusters leased in exchange for certain royalties, which the Pauls now claim they never received. In addition, another Paul entity, Bluegrass, performed various services operating wells owned by Gasbusters in February of 1996. And lastly, Delta, a third Paul entity, owns a mortgage on certain gas wells owned by Gasbusters.

After a falling out among some of the investors, Messing, through a company named FL-Gasbusters, Inc., became the effective leader of Gasbusters in 1996. At some point after that, Messing discovered that Gasbusters' certificate of limited partnership had not been filed with the Florida Department of State and, to cure this deficiency, filed an affidavit and certificate of limited

partnership that was accepted by the Department on March 11, 1997. On April 1, 1997, the Kentucky Secretary of State issued Gasbusters a certificate of authority.

On September 20, 2000, Messing brought this diversity action in federal court seeking enforcement of his loan agreement with the Pauls. The district court granted summary judgment for Messing on September 15, 2003, and entered an amended order on November 21, 2003. The district court concluded that the Pauls were in "clear breach of the conditions of closing" the stock-option agreement because the corporations either "never existed at any time during [the] negotiations" or had been administratively dissolved by the Kentucky Secretary of State. D. Ct. Op. of Sept. 15, 2003; JA 123–24. After the district court's initial judgment, Messing filed a motion to specify the liability amount and the defendants. In response, the district court decided that Michael and Timothy Paul could not "be held personally liable for the debts of the Paul entities" because "Timothy Paul never signed any of the loan documents, and Michael Paul only signed in his official capacity as President of various Paul entities." D. Ct. Op. of Nov. 18, 2003, at 12.

II.

This appeal presents three issues: (1) whether Messing breached or closed on the stock-option agreement that he signed at the same time as the loan; (2) whether the Pauls may assert counterclaims against Messing stemming from losses sustained in their dealings with Gasbusters; and (3) whether Michael and Timothy Paul may be held personally liable for Messing's damages.

A.

The Pauls first argue that Messing's recovery on the loan should be set off by his liability under the stock-option agreement. They concede that Messing never closed on the stock-option agreement and that they misrepresented their corporations' status during the relevant period. Nonetheless, once Messing announced an interest in exercising his option, they claim that he was responsible for establishing a formal "closing" and breached the agreement by "delaying the closing or refusing to close the agreement." JA 124.

The express terms of the stock-option agreement contradict the Pauls' argument. The agreement conditions Messing's obligation to close the transaction, even once he "elects to exercise his option to purchase and pay for the shares," on the Pauls' "perform[ance] and compl[iance] with all covenants, conditions, and obligations required by this agreement to be performed or complied with prior to or on the closing." JA 370. And at least twice in the agreement the Pauls represented that their corporations were "duly organized, validly existing, and in good standing." JA 367; JA 368 ("No representation or warranty of optionor herein . . . contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statement contained herein . . . misleading."). In light of their concession that these representations were false, the Pauls did not live up to their obligations "prior to . . . closing," thus absolving Messing of his duty (if any) to set a closing date once he expressed interest in purchasing the shares.

The Pauls' sole response is to rely on one part of the agreement that requires their contractual "representations and warranties . . . [to] be true and correct on and as of the closing." JA 370. According to the Pauls, this contractual obligation permitted them to misrepresent and fabricate at will *prior to* the closing, so long as their corporations were validly organized *at* the closing. But in focusing on the one provision that required their representations and warranties to be true at the time of the closing, the Pauls slight the other provisions that required them to be truthful prior to the closing. Under those provisions, the Pauls had failed to comply with the agreement's "covenants, conditions, and obligations" and Messing was thus under no requirement to close the transaction.

B.

The Pauls next argue that Messing is liable for any amounts owed them by Gasbusters because the Pauls believed that he was a general partner of the company during the relevant period. Under applicable state law:

> [A] person who makes a contribution to a business enterprise and erroneously but in good faith believes that she or he has become a limited partner in the enterprise is . . . . liable as a general partner to any third party who transacts business with the enterprise before the person withdraws and an appropriate certificate is filed to show withdrawal or before an appropriate certificate is filed to show that the person is not a general partner, but in either case only if the third party actually believed in good faith that the person was a general partner at the time of the transaction.

Fla. Stat. § 620.132; Ky. Rev. Stat. § 362.495 (stating that, under Kentucky law, "the laws of the state under which a foreign limited partnership is organized shall govern its organization and internal affairs and the liability of its limited partners").

In this case, as an initial matter, the business relationship between the Pauls and Messing did not begin until 1997, *see* JA 186 (Lester Paul testifying that "I didn't trade with Andy [Messing] until '97."), leaving only two months (before Messing filed a certificate to cure the deficiency in Gasbusters' partnership status on March 11) during which the Pauls conceivably could have believed in good faith that Messing was a general partner of the firm. One of the Pauls' counterclaims against Gasbusters stems from alleged injuries suffered before 1997, which makes it difficult to credit the Pauls' assertions that they believed at the time of the transaction that Messing could be held liable for those debts. *See* JA 85 (requesting damages for services performed in 1996). A second counterclaim requests damages resulting from a lease that Delstar (Nevada), on the Pauls' own accounting, obtained in May 2000 (admittedly from another Paul corporation, Delstar (Kentucky), but the Pauls do no not allege any pre-2000 damages)—which was over three years after Messing cured any deficiency in the Gasbusters charter. *See* JA 84. And the final counterclaim, while it conceivably could have produced damages during the two relevant months in 1997, arose out of a mortgage assigned to a Paul corporation, Delta, on September 16, 1980, well before Lester Paul testified he "trade[d]" with Messing. *See* JA 86.

Making matters worse, Lester Paul's deposition testimony directly contradicts the Pauls' assertions that they believed in good faith that Messing was a Gasbusters general partner and could be held personally liable for the partnership's debts. Responding to a question asking whether he had "any evidence that Andy Messing and the other limited partners did not intend to be a limited partnership when they joined together in Gasbusters," Paul stated, "Certainly not. I think they

intended to. I agree with that." JA 306. Paul, moreover, agreed that he "understood at all times . . . that the general partner [in Gasbusters] was a corporation out of Florida called Florida Gasbusters," an answer implying that he understood Messing's role in the company. *Id.* And when asked whether he "had a belief that [Messing] individually was the general partner of Gasbusters," Paul responded, "No. He spoke for them." *Id.*

Under normal circumstances, the Pauls are correct, summary judgment is inappropriate when it hinges on an issue delving into a party's state of mind. *See* Paul Br. at 17 (citing *Seamons v. Snow*, 206 F.3d 1021, 1027–28 (10th Cir. 2000)). In these circumstances, however—with a timeline that simply does not add up, testimony that contradicts assertions of good-faith belief and a total lack of documentary proof of damages—a rational jury could not conclude that the Pauls believed in good faith that Messing was a "general partner *at the time* of the transaction." (Emphasis added.) The district court correctly granted summary judgment on this record. *See, e.g.*, *Commonwealth v. R.J. Corman R.R. Co.*, 116 S.W.3d 488, 498 (Ky. 2003) (noting that, once one party meets its burden, the other party "in order to avoid summary judgment" must "offer at least some affirmative evidence demonstrating the existence of a genuine issue of material fact for trial").

C.

Lastly, Messing cross-appeals the district court's decision in its amended order to dismiss Michael and Timothy Paul as individual defendants.

We agree with Messing that Michael Paul's signature of the relevant contracts and promissory notes as president of Delstar Resources (Kentucky), a concededly non-existent corporation at the time, makes him personally liable under Kentucky law. Kentucky law provides that officers, directors or shareholders of dissolved corporations who continue to operate the business following dissolution (beyond the necessity of winding down the corporation's affairs) are individually liable for any debts that they incur. *See, e.g.*, *Oliver v. Wyatt*, 418 S.W.2d 403, 406 (Ky. 1967) ("If the agent is merely purporting to be acting for a principal but is in fact acting for himself, he will be personally liable on the contract."); *Steele v. Stanley*, 35 S.W.2d 867, 868 (Ky. 1931); *Huber v. House*, 2004 U.S. Dist. LEXIS 26718, at *24 (S.D. Ind. Dec. 7, 2004) ("[U]nder Kentucky law, an agent may be held personally liable on a contract made where the contract exceeded the scope of the agent's authority."); *see also Annicet Assocs., Inc. v. Rapid Access Consulting, Inc.*, 656 N.Y.S.2d 152, 154 (N.Y. Sup. Ct. 1997) (stating that the "prevailing view among [ ] jurisdictions" is that officers that carry on the business of a dissolved corporation "may be held personally liable for debts incurred by the continuation of business").

Timothy Paul, by contrast, did not sign any of these agreements himself and, besides maintaining a position as an officer in some of the Pauls' fictitious corporations, was only peripherally, if at all, involved in the Pauls' dealings with Messing. Although Kentucky has not taken a position on the liability of a corporate officer in these precise circumstances, *cf. In re Young*, 2004 Bankr. LEXIS 736, at *4–7 (E.D. Ky. Apr. 27, 2004) (summarizing Kentucky law), other jurisdictions require active participation by the officer in incurring the debts before an imposition

of personal liability, *see, e.g.*, *United States Fid. & Guar. Corp. v. Putzy*, 613 F. Supp. 594 (N.D. Ill. 1985); *Columbia Real Estate Title Ins. Co. v. Columbia Title Agency, Inc.*, 11 Ohio App. 3d 284, 286 (Ohio Ct. App. 1983). Messing, moreover, has cited no authority that squarely addresses whether an individual in Timothy Paul's position may be held liable for corporate debt. Based on our reading of the Kentucky Supreme Court's opinions in *Oliver* and *Steele* and based on our reading of the particular record before us today, we are unwilling to extend Kentucky law to individuals like Timothy Paul who, while officers in dissolved corporations, appear not to have been aware of any of the underlying transactions that created the debt. *See* JA 338–50.

The Pauls' assertion that Messing has waived this argument is unavailing. Messing's complaint includes both Michael and Timothy Paul as individual defendants. And Messing's memorandum in support of summary judgment argued that Michael and Timothy Paul were personally liable on the debt for acting "on behalf of dissolved corporations." JA 226.

III.

For these reasons, we affirm the judgment of the district court in all respects save for the liability of Michael Paul under the agreements.