**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 1, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TIM F. WOOD,

      Plaintiff-Appellant,

v.

HANDY & HARMAN CO. and
CONTINENTAL INDUSTRIES, INC.,

      Defendants-Appellees.

No. 06-5226
(D.C. No. 4:05-CV-00532-TCK-FHM)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, SEYMOUR**, and **LUCERO**, Circuit Judges.

---

Plaintiff-appellant Tim F. Wood, a former vice president at Continental Industries, Inc. ("Continental") in Tulsa, Oklahoma, appeals the district court's grant of summary judgment against him on several claims arising from the termination of his employment. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

## I

Wood was employed at Continental, a subsidiary of Handy & Harman Company ("H&H"), from 1995 until his termination on November 25, 2003. At the time of his termination, Wood was Vice President of Operations at Continental's Tulsa, Oklahoma headquarters, and he reported directly to H&H President Dan Murphy. According to Wood, he was fired either in retaliation for defending the rights of a subordinate under the Family and Medical Leave Act of 1993 ("FMLA"), or in retaliation for reporting an environmental issue to an H&H manager. Continental and H&H (collectively "defendants") maintain that Wood was actually fired because he had a conflict of interest, as he was running an outside business while employed at Continental.

Wood's FMLA claim arises from an exchange that occurred one week before his termination. Wood was approached by Amy Brogle,[1] an employee of a different H&H subsidiary who was assigned to act as the temporary head of Human Resources at Continental. Brogle asked Wood to deliver a memo (the "Carter memo") to Ruby Carter, a 29-year employee of Continental whom Wood indirectly supervised. Carter was on leave due to her husband's terminal illness. The memo informed Carter that, contrary to her direct supervisor's assurance, her leave was not covered by the FMLA because she had already exhausted her FMLA entitlement by taking a prior medical leave.

---

[1] The record also refers to Brogle as "Amy Hoagland" and "Amy Ratura."

When Wood read the Carter memo, he concluded that it was inconsistent with Continental's usual practices regarding employee leave and that it incorrectly "challenged" Carter's right to FMLA protection during her leave. He told Brogle that he disagreed with the memo and would not deliver it. Brogle reacted angrily to this objection and left Wood's office. She later told another employee, Joanne Horne, that Wood was an "[expletive] idiot." According to Horne, she "had never seen [Brogle] so angry."

Sometime after the confrontation between Wood and Brogle over the Carter memo,[2] Murphy left Brogle a message requesting that she call him to discuss Wood's job performance. Brogle promptly returned the call, and reported the following concerns: (1) "it was increasingly difficult . . . to locate Mr. Wood in order to deal with matters relating to H[uman] R[esources] at Continental," (2) Wood "had a personal business on the side outside of his full-time role at Continental," and (3) Wood "was not consistent in how he applied formal policies and practices in the workplace with the employees." During discovery, Brogle denied telling Murphy specifically about Wood's refusal to deliver the Carter memo. For his part, Murphy stated that he did not remember Brogle describing

---

[2] Although the record does not reveal the exact date of this conversation, it indicates that the call occurred no more than "days" before Wood's termination on November 25. Viewing the facts in the light most favorable to Wood, the record thus supports an inference that the call occurred after the memo incident.

any particular failure to follow her instructions, but admitted that he did not remember "the specifics" of his conversation with Brogle.

Wood also alleges that he was fired for reporting a potential environmental problem on Continental property. Around the same time as the Carter memo incident, Wood informed David Kelly, Environmental Health and Safety Director for H&H, that he had been alerted to the smell of solvent on Continental property. He told Kelly that he feared the odor might indicate a toxic spill or leak. Kelly told Wood that "he would take control of the situation." Wood heard nothing more about the matter, or any responsive action, because he was fired shortly thereafter. Murphy later testified that neither Kelly nor anyone else at Continental or H&H ever mentioned Wood's environmental concern to him.

The defendants have offered an alternate explanation for Wood's termination. Beginning in 2001, Wood and his family ran a business called B&B Meters ("B&B"). Wood sometimes used his Continental cell phone for B&B business and conducted such business during his normal working hours at Continental. B&B was a Continental customer on at least one occasion in 2001, and all managers at Continental, including Brogle, were aware of Wood's relationship with B&B. Murphy, however, testified in depositions that he knew nothing about B&B until shortly before he terminated Wood. He stated that he learned of B&B from another H&H officer in November 2003, and immediately

placed the aforementioned phone call to Brogle as well as a call to Tim Hoagland, a Continental vice president who worked closely with Wood.

Following these events, on November 21, 2003, Wood received a phone call from Murphy requesting that he report to H&H's offices in Rye, New York. On November 25, Wood met with Murphy and two other H&H officers, and Murphy informed him he was being terminated for "running a business on company time." Wood was not given an opportunity to improve his performance through a progressive discipline plan.

After his termination, Wood filed a complaint against the defendants, asserting four claims: (1) retaliatory discharge for defending another employee's FMLA rights, in violation of 29 U.S.C. § 2615(a)(2); (2) wrongful discharge in violation of public policy under Burk v. K-Mart Corp., 770 P.2d 24, 28 (Okla. 1989); (3) breach of an implied employment contract requiring progressive discipline; and (4) negligent or intentional infliction of emotional distress. The defendants moved to dismiss Wood's Burk tort claim under Federal Rule of Civil Procedure 12(b)(6), asserting that Wood had failed to identify a specific Oklahoma public policy violated by his discharge. Denying the motion, the district court found that Wood's factual allegations "may support a Burk tort under Oklahoma law, depending on . . . further development and explanation of relevant . . . law in later stages of the proceedings." The court cautioned Wood,

however, that he "must, during discovery, identify" a clear public policy supporting this cause of action.

When the discovery deadline passed, the defendants moved for summary judgment on all claims. As to the Burk claim, they contended that Wood had failed to identify a clear public policy supporting his cause of action in accordance with the court's earlier order. In his response brief, Wood identified several public policies supporting his tort claim for the first time. Three days after his brief was filed, Wood served the defendants with a "supplemental discovery response" setting forth these same policies.

Summary judgment was granted to the defendants on all claims. As to Wood's FMLA claim, the court concluded that Wood had failed to show that his protected action caused his loss of employment because he did not offer enough evidence that Murphy, the relevant decisionmaker, was aware of the dispute over the Carter memo. On the Burk claim, the court rejected all public policies presented by Wood during discovery as insufficiently specific. The court refused to consider his belated "supplemental discovery response," because it was "out of time and out of compliance with the Court's prior Order." With respect to the implied contract claim, the court determined the Wood had offered inadequate evidence of an implied contract requiring the defendants to impose progressive discipline before terminating Wood. Finally, the court construed Wood's emotional distress claim as two separate claims: a claim for negligent termination

and a claim for intentional infliction of emotional distress. Both theories were rejected, upon the conclusion that Wood had failed to demonstrate issues of fact about whether his termination was wrongful, as required to show negligent termination, or about whether the defendants' actions were "outrageous," as required to show intentional infliction of emotional distress. Wood appeals the court's entry of summary judgment against him as to all claims other than intentional infliction of emotional distress.

## II

We review a grant of summary judgment de novo, using the same legal standard applied by the district court. Somoza v. Univ. of Denver, 513 F.3d 1206, 1211 (10th Cir. 2008). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party, and "consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues." Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, "[w]here different ultimate inferences may properly be drawn, the case is

-7-

not one for a summary judgment." Seamons, 206 F.3d at 1026 (quotation

omitted).[3]

## A

Under the FMLA, it is "unlawful for any employer to discharge or in any

other manner discriminate against any individual for opposing any practice made

unlawful" under the Act. 29 U.S.C. § 2615(a)(2).[4] Retaliation claims under the

FMLA are subject to the burden-shifting framework of McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 802-04 (1973). Metzler v. Fed. Home Loan Bank of

Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006). "Under this analysis, the plaintiff

---

[3] The defendants maintain that their statement of material facts was undisputed because Wood violated Northern District of Oklahoma Local Civil Rule 56.1(c) by failing to submit his response to that statement in the required form. See Reed v. Nellcor Puritan Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002) (explaining that a district court has discretion to sanction a violation of its local rules by declining to consider those facts which are presented in violation of the rule). But the district court elected not to exclude Wood's factual allegations based on the violation, stating that it would consider all of the evidence in the record "[b]ecause Wood did attach an evidentiary record, because the parties have expended resources in addressing the merits, and because the Court favors resolving disputes on the merits." It was not an abuse of discretion for the district court to consider the full record, and we will therefore do the same on appeal.

[4] Prior to oral argument in this case, we ordered supplemental briefing on the question of whether the FMLA gives Wood statutory standing to sue for retaliation for defending the rights of another employee, as opposed to his own FMLA rights. Because Wood ultimately does not prevail on the merits, however, we need not decide whether he in fact has statutory standing. Carolina Cas. Ins. Co. v. Pinnacol Assurance, 425 F.3d 921, 926 (10th Cir. 2005) ("Unlike constitutional standing, . . . statutory standing need not be resolved before consideration of the merits. . . . [I]f [the plaintiff] loses on the merits, the issue of statutory standing becomes moot and need not be addressed.").

bears the initial burden of establishing a prima facie case of retaliation." Id. If the plaintiff succeeds in meeting this burden, the defendant must then offer a legitimate, nonretaliatory justification for the employment action. Id. If the employer does so, then the burden again shifts to the plaintiff to demonstrate that the proffered reason is a mere pretext for retaliation. Id.

**1**

In order to establish a prima facie case of FMLA retaliation, Wood was required to demonstrate that: "(1) [he] engaged in a protected activity, (2) [the defendants] took an action that a reasonable employee would have found materially adverse, and (3) there exists a causal connection between the protected activity and the adverse action." Id. at 1171. On appeal, the defendants do not contest whether Wood has met his burden as to the first two prongs of the prima facie case. We thus consider only whether Wood has demonstrated a genuine issue of material fact regarding causation.

An essential component of causation is the decisionmaker's knowledge of the protected activity; if knowledge is lacking, then the protected act cannot be said to have caused the adverse employment action. See Jones v. United Postal Serv., Inc., 502 F.3d 1176, 1195 (10th Cir. 2007). Causation therefore exists only if a jury could reasonably infer that Murphy knew of the FMLA incident prior to Wood's termination. Wood contends that a jury could infer from Brogle's conduct and statements that she told Murphy about the Carter memo incident in

her return call to him. The defendants rejoin that a reasonable jury could not infer that Murphy knew about the incident, because both Brogle and Murphy—the two participants in the conversation—deny speaking about it.

Wood has produced enough evidence to survive summary judgment on this question. We have long held that "summary judgment should not be based on the deposition or affidavit of an interested party . . . as to facts known only to him—a situation where demeanor evidence might serve as real evidence to persuade a trier of fact to reject his testimony." Madison v. Deseret Livestock Co., 574 F.2d 1027, 1037 (10th Cir. 1978); see also Seamons, 206 F.3d at 1028; Anderson v. Deere & Co., 852 F.2d 1244, 1248 (10th Cir. 1988) (quoting Madison). A nonmoving party must, of course, do more than "merely assert that the jury might" disbelieve the testimony of interested witnesses; he must present his own affirmative evidence of those facts which are contradicted by the interested testimony. Liberty Lobby, 477 U.S. at 256-57. Wood has met this standard.

The record reveals that Brogle was extremely angry with Wood following his refusal to give Carter the disputed memo. Just a few days after this incident occurred, Murphy called Brogle, and asked whether she had any concerns about Wood. When Brogle returned the call, she told Murphy that her "biggest concern with [Wood] was that he was not consistent in how he applied formal policies and practices in the workplace with the employees." Although Brogle specifically denies telling Murphy about Wood's handling of the Carter memo, a jury with an

-10-

opportunity to assess Brogle's demeanor might find this denial to be noncredible, particularly so given that nothing in the record suggests any basis for Brogle's stated concern other than the Carter memo incident. A jury might similarly find that Murphy's testimony that he "did not recall" learning of the incident from Brogle was not credible, or alternately, that Murphy had simply forgotten the exact content of the conversation. If so, the jury could infer from Wood's and Horne's testimony that Brogle's anger about the incident would have led her, when asked about Wood's performance days later, to describe it to Murphy as an example of Wood's failures to "appl[y] formal policies and practices in the workplace." In short, the foregoing evidence takes Wood's argument beyond a bare assertion that the jury might disbelieve Brogle and Murphy. Coupled with the close timing between the Carter memo incident, Brogle's phonecall, and Wood's termination, Wood has carried his burden of raising a genuine issue of material fact regarding Murphy's knowledge. See, e.g., Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996) ("[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive.").

**2**

Because Wood adduced sufficient evidence to establish a prima facie case of retaliation, we turn to the remaining steps in the McDonnell Douglas framework. Although the district court, in light of its conclusion regarding causation, did not reach these steps, "we have discretion to affirm on any ground

-11-

adequately supported by the record so long as the parties have had a fair opportunity to address that ground." Gomes v. Wood, 451 F.3d 1122, 1133 (10th Cir. 2006). At the time of the trial court's ruling, the parties had conducted complete discovery and fully briefed their positions, including the issue of pretext.

Once a plaintiff makes out a prima facie case of an FMLA violation, the burden shifts to the defendant to offer a legitimate, nonretaliatory basis for the adverse employment action. Metzler, 464 F.3d at 1170 (citing McDonnell Douglas, 411 U.S. at 802-04). It is undisputed that the defendants met that burden with Murphy's testimony that he decided to terminate Wood due to his belated discovery of Wood's involvement with B&B. Thus, the burden shifts back to Wood, who must "demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." Trujillo v. PacifiCorp, 524 F.3d 1149, 1158 (10th Cir. 2008) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1321 (10th Cir. 1997)).

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (quoting Morgan, 108 F.3d at 1321). Wood argues that he produced evidence that Murphy's proffered reason for his

termination is a mere pretext for retaliation. Specifically, he maintains that it is implausible that Murphy only learned of the existence of B&B in November 2003, for two reasons: First, because B&B was a Continental customer in 2001, and second, because a jury could infer that Amy Brogle and Tim Hoagland, who were undisputedly aware of B&B, would have told Murphy about Wood's involvement with the outside business long before November 2003.

Wood's evidence does not support either theory. The only evidence in the record of any transaction between B&B and Continental is a single 2001 Continental invoice addressed to B&B, recording the sale of $448.50 in products. Wood does not explain why Murphy, the president of Continental's parent company, would have been aware of this minor transaction. Even assuming that Murphy did learn of the transaction, Wood has not produced any evidence indicating that he would also have learned the identity of B&B's owner, since the only name listed on the invoice is Roy Wood, not Tim Wood.

As for the theory that Brogle and Hoagland must have mentioned B&B to Murphy prior to November 2003, Wood's evidence not only fails to support such an inference, but also undermines it. For example, an affidavit from Tulsa Plant Manager Bruce Neal states that if Brogle or Hoagland "had any questions or criticisms of Tim Wood regarding B&B Meter, it would have been raised in our meetings and privately with Tim Wood"—not to Murphy. In contrast to his claims regarding the Carter memo incident, Wood does not point to any particular

-13-

conversation between Murphy and Brogle or Hoagland during which the subject of B&B might have been expected to arise. Thus, even viewed in the light most favorable to Wood, the evidence does not create a dispute of material fact as to whether the defendants' proffered reason for his termination was so implausible as to be "unworthy of belief." Trujillo, 524 F.3d at 1158. We therefore affirm summary judgment against Wood on his claim of FMLA retaliation.[5]

**B**

Wood urges us to reverse summary judgement on his Burk tort claim, maintaining that the district court abused its discretion in refusing to consider the public policies advanced after the close of discovery. Alternatively, he argues that the court erred by excluding this evidence without first considering the factors articulated in Meade v. Grubbs, 841 F.2d 1512, 1521 n.7 (10th Cir. 1988). "[W]e review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion," Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 894 (10th Cir. 1997), and will not disturb such a determination on review "unless we have a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1019

---

[5] Wood summarily requests an award of attorneys' fees incurred in appealing the grant of summary judgment on his FMLA claim. See 29 U.S.C. § 2617(a)(3). Because Wood has failed to prevail on his claim, the request is denied.

(10th Cir. 2002) (quoting <u>United States v. Ortiz</u>, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

In its order denying the defendants' motion to dismiss Wood's <u>Burk</u> claim, the district court ordered Wood to identify a clear public policy protecting his actions "during discovery." Defendants requested this information from Wood by interrogatory before the close of discovery. They received a response that identified a provision of the Oklahoma Environmental Quality Code as well as several Oklahoma cases addressing the procedural and substantive rights of landowners affected by pollution and environmental permitting processes.

After the close of discovery, defendants filed their motion for summary judgment, arguing that the aforementioned policies did not protect Wood from termination. In his brief responding to the motion, Wood then identified several previously unmentioned Oklahoma statutes and cases as support for his <u>Burk</u> claim. Three days later, and two months after the close of discovery, he served the defendants with a supplemental discovery response identifying these same authorities. Granting summary judgment on Wood's public policy claim, the district court declined to consider this late response.[6]

---

[6] It also found that none of the authorities identified before the close of discovery provided a sufficiently "clear and compelling" Oklahoma public policy to support a <u>Burk</u> claim. <u>See</u> <u>Clinton v. Okla.</u>, 29 P.3d 543, 546 (Okla. 2001) (holding that a <u>Burk</u> plaintiff "must identify an Oklahoma public policy goal that is clear and compelling and is articulated in existing Oklahoma constitutional, statutory or jurisprudential law"). Wood does not challenge this latter aspect of the court's decision.

We make two observations in rejecting Wood's arguments. "It is generally not an abuse of discretion for a court to exclude evidence based upon failure to timely designate." Santana v. City & County of Denver, 488 F.3d 860, 867 (10th Cir. 2007). Wood had ample opportunity to comply with the district court's order by identifying all policies he wished to bring to the court's (and the defendants') attention, and he simply failed to do so.[7] In addition, our holding in Meade only requires a district court to consider certain equitable factors before imposing the ultimate sanction of dismissal, a requirement justified by the extraordinary nature of that sanction. See 841 F.2d at 1520. Exclusion of belated evidence, by contrast, is a matter of pure district court discretion, unrestrained by such guiding factors. See Sports Racing Servs., 131 F.3d at 894. We see no abuse of discretion and therefore affirm the grant of summary judgment against Wood on his Burk claim.

## C

This brings us to Wood's claim that the defendants breached an implied employment contract when they failed to offer him progressive discipline before termination. The district court properly concluded that this claim fails under the balancing test summarized in Bowen v. Income Producing Management of

_____

[7] Wood points out that the district court's order denying the motion to dismiss did not specify a date by which this information was due. However, the phrase "during discovery" admits of no ambiguity where a discovery deadline exists, and we consequently agree that the "supplemental response" was untimely.

-16-

Oklahoma, Inc., 202 F.3d 1282, 1284 (10th Cir. 2000). At the summary judgment stage, an employee seeking to challenge his termination under an implied employment contract theory bears the burden of raising an issue of material fact regarding whether a contract existed. See Dupree v. United Postal Serv., Inc., 956 F.2d 219, 222-23 (10th Cir. 1992). In Bowen, we summarized Oklahoma law regarding formation of an implied contract as follows:

> To determine whether the parties intended to form a contract, five factors are balanced: (a) evidence of "separate consideration" beyond the employee's services; (b) length of employment; (c) employer handbooks and policy manuals; (d) detrimental reliance by the employee; and (e) promotions and commendations.

202 F.3d at 1284 (citing Hinson v. Cameron, 742 P.2d 549, 554-55 (Okla. 1987)).

Wood has failed to meet his burden of showing that an implied contract existed. The only evidence presented is his recollection that a 1995 Continental handbook mentioned a policy of progressive discipline and Neal's affidavit that Human Resources required him to follow such a policy before terminating employees. This is insufficient. Under Oklahoma law, an employee's understanding of company policy is simply not a factor supporting the existence of an implied contract unless this impression led to detrimental reliance, which Wood does not claim. Moreover, his vague recollection of the contents of the 1995 handbook does not support a jury conclusion that "employer handbooks and policy manuals" actually established a progressive discipline policy. To the contrary, the only handbook in the record—the 1999 version in effect at the time

of Wood's discharge—mentions no such policy. Even if it did, <u>Bowen</u> provides that "'an employer may deny (or disclaim) any intent to make the provisions of a personnel manual part of an employment relationship' so long as the disclaimer is clear and the employer's conduct does not negate the disclaimer's effect." <u>Id.</u> at 1285 (quoting <u>Russell v. Bd. of County Comm'rs</u>, 952 P.2d 492, 502 (Okla. 1997)). On point, the 1999 handbook explicitly states that "[a]ll employees who do not have a separate, written employment contract with the company for a specific term of employment are employed at the will of the company" and that "[n]othing in this material represents a contract of any kind."

Because Wood has produced no other evidence relevant to the <u>Bowen</u> factors, the district court was correct to find that he has not created a material issue of fact as to the existence of an implied contract. Summary judgment was therefore proper on this claim.[8]

---

[8] Wood also contends that the district court erred by alternately granting summary judgment against him as a sanction for his failure to comply with Rule 56.1(c), without first conducting the analysis required by <u>Meade</u>. Because we affirm the grant of summary judgment against him on the merits of all claims, we need not consider the district court's alternate basis for its judgment.

As for Wood's negligent termination claim, his only argument on appeal is that we must remand this claim if we reverse the grant of summary judgment on any of his other claims. Again, because we affirm, we need not address this argument.

## III

For the foregoing reasons, we **AFFIRM** the grant of summary judgment to the defendants.  Wood's request for attorney's fees is **DENIED**.


ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge