*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFF LOWERY, individually and as next friend of
Derrick "Rabbit" Lowery, LISA A. LOWERY,
individually and as next friend of Derrick "Rabbit"
Lowery, RANDY GILES, individually and as next
friend of Jacob Giles, STACEY GUTHRIE,
individually and as next friend of Joseph Dooley,
JAMES SPURLOCK, individually and as next friend of
Dillan Spurlock, LORA SPURLOCK, individually and
as next friend of Dillan Spurlock,

                *Plaintiffs-Appellees,*

    *v.*

MARTY EUVERARD, DALE SCHNEITMAN, CRAIG
KISABETH, JEFFERSON COUNTY BOARD OF
EDUCATION,

                *Defendants-Appellants.*

No. 06-6172

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00560—Thomas W. Phillips, District Judge.

Argued: April 24, 2007

Decided and Filed: August 3, 2007

Before: SILER and GILMAN, Circuit Judges; ZATKOFF, District Judge.[*]

---

## COUNSEL

**ARGUED:** Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, Knoxville, Tennessee, for Appellants. Matthew M. Scoggins III, BASS, BERRY & SIMS, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, Knoxville, Tennessee, for Appellants. Matthew M. Scoggins III, Michael S. Kelley, BASS, BERRY & SIMS, Knoxville, Tennessee, for Appellees.

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

ZATKOFF, D. J., delivered the opinion of the court, in which SILER, J., joined. GILMAN, J. (pp. 17-21), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

LAWRENCE P. ZATKOFF, District Judge. Plaintiffs brought suit in federal court after they were dismissed from their high school football team. Defendants brought a motion for summary judgment based on qualified immunity, which the district court denied. On appeal, Defendants argue that Plaintiffs' dismissal was permissible under the rule governing student speech set forth in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). For the reasons set forth below, we **REVERSE** the district court's denial of Defendants' motion for summary judgment.

## I. BACKGROUND

**A.      Factual background**

Derrick Lowery, Jacob Giles, Joseph Dooley, and Dillon Spurlock (hereinafter "Plaintiffs")[1] were students at Jefferson County High School in Tennessee during the 2005-06 school year. All four were members of the Jefferson County varsity football team. Defendant Euverard became the head varsity football coach at Jefferson County in 2004. During the 2005 season, many of the Jefferson County football players, including Plaintiffs, became dissatisfied with Euverard's coaching methods. Plaintiffs allege that Euverard struck a player in the helmet, threw away college recruiting letters to disfavored players, humiliated and degraded players, used inappropriate language, and required a year-round conditioning program in violation of high school rules.

In early October of 2005, after discussions with Dooley and Lowery, Giles typed the following statement: "I hate Coach Euvard [sic] and I don't want to play for him." JA at 745. Giles and Dooley asked other players to sign the petition, which would be held until after the football season. Giles and Dooley intended to then give the petition to Defendant Schneitman, the principal of Jefferson County, in order to have Euverard replaced as head coach. JA at 580. Eighteen players eventually signed the petition, including Spurlock.

Euverard learned of the petition on October 7, 2005. Darren Whitehead, another player on the team, told Assistant Coach Ricky Upton about the petition, who then told Euverard. Euverard called an all-coaches meeting on October 9. Schneitman was also present at the meeting. At the meeting, the coaches discussed how to deal with the petition. The coaches decided to question the players individually to learn more about the petition.

When the players arrived for practice on October 10 they were told to sit in front of their lockers and remain quiet. Players were then taken one by one into an office in the weight room where they were interviewed by Euverard. Assistant Coach Brimer was also present in the office, taking notes. All the players were asked the same questions: (1) Have you heard about the petition?, (2) Did you sign it?, (3) Who asked you to sign it?, and (4) Do you want to play football with Coach Euverard as coach?

When Wesley Lee, a player who had signed the petition, was called for his interview, Lowery called out "are you alright?" Assistant Coach Pippenger then asked Lowery to come over.

---

[1]The players' next friends brought suit on behalf of the players; for convenience the Court will refer to the players as Plaintiffs.

At first Lowery refused, and then walked over to Pippenger. Lowery told Pippenger "don't put your hands on me," or words to that effect, and refused to go outside with Pippenger. Giles and Dooley then got up and stood by Lowery. Pippenger took the three of them into the weight room, and told Euverard about the situation. Euverard attempted to interview the three boys individually, but they said they would only meet with Euverard as a group. Euverard told them that if they were going to be that way, they could pick up their things and leave. Giles, Dooley, and Lowery gathered their belongings and left. As they were leaving, Dooley said to the other players "I know how much you hate him, and you guys need to leave with us right now." JA at 673.

Spurlock was not at school on October 10. Euverard interviewed Spurlock on October 11, and Spurlock told Euverard that he signed the petition. Euverard asked Spurlock if he still felt that way, and Spurlock answered that he loved football. Euverard then asked Spurlock if he wanted to play football with Euverard as head coach. Spurlock said no, but that he wanted to play for Jefferson County. Euverard told Spurlock to get his stuff, and that he was no longer on the team. Players who signed the petition but apologized to Euverard and told him they wanted to play for him were allowed to remain on the team.

## B.     Procedural background

Plaintiffs filed suit on December 9, 2005. The district court denied Defendants' motion for summary judgment based on qualified immunity on August 22, 2006, holding that there was an issue of fact regarding whether the petition disrupted the team. Defendants timely appealed the denial to this Court.

## II. ANALYSIS

## A.     Standard of review

A district court's denial of qualified immunity is reviewed *de novo*. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

## B.     Jurisdiction

A denial of qualified immunity based on legal grounds is an appealable final decision within the meaning of 28 U.S.C. § 1291. *Sample v. Bailey*, 409 F.3d 689, 694 (6th Cir. 2005). However, a denial of qualified immunity based on evidentiary issues is not an appealable decision. *Id.* at 695. Plaintiffs argue that there are contested evidentiary issues regarding the real reason why they were dismissed from the football team.

Plaintiffs do not deny, however, their participation in the petition in question. Nor do Plaintiffs Lowery, Giles, and Dooley dispute their insubordinate actions during the team meeting on October 10, 2005. The amount of constitutional protection due the petition is a legal question properly before the Court on interlocutory appeal.

## C.     Application of *Tinker* to the petition

A two-part test is used to determine if a government official is entitled to qualified immunity. First, the Court must determine if the official's conduct violated a constitutional right. If this question is answered in the affirmative, the Court must determine if the right was clearly established at the time of the violation. *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). Thus, the Court must first determine if Plaintiffs' First Amendment rights were violated when they were dismissed from the football team.

In the 1986 movie *Hoosiers*, Gene Hackman plays Norman Dale, the new basketball coach at a small Indiana high school. On the first day of practice Dale makes an introductory speech to the players. All of the players attentively listen to Dale except two, who are talking to each other. Dale notices the two players talking, and the following dialogue ensues:

> Dale: Basketball is a voluntary activity. It's not a requirement. If any of you feel you don't want to be on the team, feel free to leave right now. Did you hear what I just said?
>
> Player: Me?
>
> Dale: Yes, you.
>
> Player: Sure, I'm just kinda curious to know when we start.
>
> Dale: We start when I say so.
>
> Player: Ok, would you kinda let me know, 'cause I'm kinda getting tired of standing.
>
> Dale: Alright. Out. Out of here. Right now.

The two players then leave the gym. Shortly thereafter one of the players returns with his father, who informs Dale that his son has something to say. The player apologizes to Dale and asks for a second chance. Dale accepts the apology and tells the player to suit up. The other player is not heard from again.

The movie takes place in the 1950s, before the Supreme Court case of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), which held that the First Amendment does not stop "at the schoolhouse gate." *Id.* at 507. Assuming that *Tinker* was in force at the time of *Hoosiers*, would the players have a First Amendment claim against Coach Dale? That hypothetical case is not before the Court, but the instant case, although it contains different facts, presents a similar question: what is the proper balance between a student athlete's First Amendment rights and a coach's need to maintain order and discipline?

The contour of First Amendment protection given to speech depends upon the context. For example, it is beyond question that citizens have a First Amendment right to criticize the government's military policy. However, does this mean that an enlisted soldier has a First Amendment right to be disrespectful towards his commanding officer? To ask that question is to answer it. Likewise, citizens have a First Amendment right to criticize a particular government official, but that right is circumscribed when the citizen works for the official. *See Connick v. Meyers*, 561 U.S. 138 (1983).

The First Amendment rights of students are also limited. Of course, it is axiomatic that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 507. However, the Supreme Court has also held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986). Furthermore, the constitution does not compel "school officials to surrender control of the American public school system to public school students." *Id.* at 686 (quoting *Tinker*, 393 U.S. at 526 (Black, J., dissenting)).

The limitation on students' First Amendment rights derives from the mission of the public school system. "The primary duty of school officials and teachers . . . is the education and training of young people. . . . Without first establishing discipline and maintaining order, teachers cannot

begin to educate their students." *N.J. v. T. L.O.*, 469 U.S. 325, 350 (1985) (Powell, J., concurring). Public schools are necessarily not run as a democracy. Schools exist to provide a forum whereby those with wisdom and experience (the teachers) impart knowledge to those who lack wisdom and experience (the students). Unlike our system of government, the authority structure is not bottom-up, but top-down. The authority of school officials does not depend upon the consent of the students. To threaten this structure is to threaten the mission of the public school system.

However, while public schools are not run as democracies, neither are they run as Stalinist regimes. Students do have First Amendment rights, and school officials do not have unfettered authority to regulate student speech. The Supreme Court has established three frameworks for evaluating student speech: (1) vulgar and obscene speech is governed by *Bethel School Dist. v. Fraser*, 478 U.S. 675 (1986); (2) school-sponsored speech is governed by *Hazelwood v. Kuhlmeier*, 484 U.S. 260 (1988); and (3) all other speech is governed by *Tinker*.

The parties agree that the instant case is governed by *Tinker*. Pursuant to *Tinker*, school officials may regulate speech that materially and substantially interferes "with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 513. However, *Tinker* does not prescribe a uniform, "one size fits all" analysis. The Court must consider the content and context of the speech, and the nature of the school's response.

The speech in question in this case occurred in the context of a high school football program. It is well-established that students do not have a general constitutional right to participate in extracurricular athletics. *See Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 763 (6th Cir. 1999), *rev'd on other grounds*, 531 U.S. 288 (2001); *Alerding v. Ohio High School Athletic Ass'n.*, 779 F.2d 315 (6th Cir 1985); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338 (3d Cir 2004); *Niles v. University Interscholastic League*, 715 F.2d 1027 (5th Cir. 1983). As this Court has noted, "[t]he main purpose of high school is to learn science, the liberal arts and vocational studies, not to play football and basketball." *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 387 (6th Cir. 1992).

The Supreme Court has held that student athletes are subject to more restrictions than the student body at large. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). This greater degree of oversight is due to the differing natures of the classroom and playing field. One of the purposes of education is to train students to fulfill their role in a free society. Thus, it is appropriate for students to learn to express and evaluate competing viewpoints. The goal of an athletic team is much narrower. Of course, students may participate in extracurricular sports for any number of reasons: to develop discipline, to experience comradery and bonding with other students, for the sheer "love of the game," etc. Athletic programs may also produce long-term benefits by distilling positive character traits in the players. However, the immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal. As this Court has recognized:

> Unlike the classroom teacher whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline, [the role of a coach] is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount.

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995).

The above considerations require the Court to carefully frame the issue for determination in the instant case. The issue is not whether the Court approves of Euverard's methods, or whether it thinks Plaintiffs' dismissal from the team was fair. The Supreme Court has held that:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . The

system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland*, 420 U.S. 308, 326 (1975).

Plaintiffs suggest that the issue is whether it is permissible for school officials to engage in viewpoint discrimination against student athletes. However, this formulation is overly abstract, and also misleading. This case is not primarily about Plaintiffs' right to express their opinions, but rather their alleged right to belong to the Jefferson County football team on their own terms. The specific question presented by this case is whether Plaintiffs had a right to remain on the football team after participating in a petition that stated "I hate Coach Euvard [sic] and I don't want to play for him."

Plaintiffs rely primarily on *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006), and *Seamons v. Snow*, 206 F.3d 1021 (10th Cir. 2000). In *Pinard*, high school basketball players alleged they had been physically and psychologically intimidated by their coach. Aware of the players' dissatisfaction, the coach told them "if they wanted him to quit, they should say so, and he would resign." *Pinard*, 467 F.3d at 760. In response, the players prepared and signed a petition calling for the resignation of the coach. All the players except the coach's son signed the petition. The players then refused to participate in the next basketball game, and were dismissed from the team. The Ninth Circuit held that the players' petition was permitted by *Tinker*, but not the refusal to participate in the game. *Id.* at 768-69.

In *Seamons*, a high school football player was attacked by four of his teammates and tied to a towel rack with highly adhesive athletic tape. Another teammate brought one of the player's ex-girlfriends into the locker room to watch the proceedings. The player reported the incident to the police and school authorities. The coach told the player he needed to apologize to the team for reporting the incident. When he refused, he was dismissed from the team. The Tenth Circuit overruled the district court's grant of summary judgment for the defendants, holding that there were genuine issues of material fact regarding whether the player's First Amendment rights were violated.

Defendants rely primarily on *Wildman v. Marshalltown*, 249 F.3d 768 (8th Cir. 2001). In *Wildman*, a high school basketball player was upset by her coach's failure to promote her to the varsity team. She distributed a letter to her teammates, containing the following language:

> I think that we have to fight for our position. Am I the only one who thinks that some of us should be playing Varsity or even JV? We as a team have to do something about this. I want to say something to Coach Rowles. I will not say anything to him without the whole teams [sic] support. He needs us next year and the year after and what if we aren't there for him? It is time to give him back some of the bullshit that he has given us. We are a really great team and by the time we are seniors and we ALL have worked hard we are going to have an AWESOME season. We deserve better then [sic] what we have gotten. We now need to stand up for what we believe in!!!

*Id.* at 770. After the coach became aware of the letter, he demanded that the player apologize. The player refused, and was dismissed from the team. The player argued that the letter was protected by *Tinker*, because it "was a personal communication to other students containing her personal expression." *Id.* at 771. The school officials argued that they had an interest in affording the team "an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team." *Id.* The Eighth

Circuit held that the player's letter constituted "insubordinate speech toward her coaches." *Id.* at 772. The Eighth Circuit further held that:

> The school did not interfere with Wildman's regular education. A difference exists between being in the classroom, which was not affected here, and playing on an athletic team when the requirement is that the player only apologize to her teammates and her coach for circulating an insubordinate letter. We agree with the district court's conclusions that the letter did suggest, at the least, that the team unite in defiance of the coach (where Wildman wrote that the coach "needs us next year and the year after and what if we aren't there for him?" and "it is time to give him back some of the bullshit that he has given us" and "we now need to stand up for what we believe in" and "I think that we have to fight for our position") and that the actions taken by the coaches in response were reasonable. Moreover, coaches deserve a modicum of respect from athletes, particularly in an academic setting.

*Id.*

Plaintiffs argue that the problem with the *Wildman* letter was the use of the word "bullshit," but that is not an accurate summation of the Eighth Circuit's reasoning. The Eighth Circuit did cite the word "bullshit" as an example of the letter's inappropriateness, but also noted that the suggestion that the team unite in defiance of the coach was insubordinate. The Eighth Circuit cited both *Tinker* and *Fraser* (which governs obscene speech), and did not specify which framework it was using. However, the district court opinion, which the Eighth Circuit affirmed, found that the letter "materially interfered [with] or substantially disrupted a school activity," which is the *Tinker* standard.

Under Plaintiffs' reasoning, the *Wildman* letter would have acceptable had it not contained the word "bullshit," and the instant petition is acceptable because it does not contain any obscenity. However, this conclusion elevates form over substance, and misses the point of the Eighth Circuit's reasoning. Even if the *Wildman* letter had not contained obscenity, the suggestion that the team unite in defiance of the coach would still have been insubordinate. Likewise, the instant petition constituted a direct challenge to Coach Euverard's authority. While the instant petition does not contain obscenity, it does contain strong language: "I hate Coach Euvard [sic]." "Hate" is one of the strongest words in the English language, and carries particularly negative connotations: crimes motivated by bigotry are termed "hate" crimes.

Furthermore, the instant petition contained a stronger challenge to the coach's authority than the *Wildman* letter. Plaintiff Giles, who typed the petition, stated that purpose of the petition was to have Euverard replaced as head coach. JA at 580. In contrast, while the *Wildman* author was clearly dissatisfied with her coach's decisions, there is no indication that she wanted to have the coach fired, and she stated that she was not advocating a strike or boycott. *Wildman*, 249 F.3d at 770. The *Wildman* author also stated that she would not say anything to the coach without the whole team's support.

Both *Seamons* and *Pinard* present very different scenarios. The player in *Seamons* did not attempt to have his coach fired; he reported a serious matter, an assault, to the authorities. In *Pinard*, the players prepared a petition calling for their coach's resignation after he invited them to say if they wanted him to quit, and the coach *did not dispute* the players' claim that the petition was not disruptive. This is a crucial distinction from the instant case: the coach in *Pinard* voluntarily put his authority into play, so to speak. This is entirely consistent with the top-down authority structure discussed above: coaches have the prerogative to open up the question of their authority if they so choose. But this does not mean that the players have a corresponding right to unilaterally undertake a referendum on the coach's authority. Creating the latter right would be tantamount to

establishing a bottom-up authority structure for high school athletics. A high school athletic team could not function smoothly with an authority structure based on the will of the players. As this Court has recognized, the team's "plays and strategies are seldom up for debate. Execution of the coach's will is paramount." *Dambrot*, 55 F.3d at 1190. Thus, the facts of the instant case are far more analogous to *Wildman* than to *Seamons* or *Pinard*, supporting the conclusion that there was no constitutional violation in Plaintiffs' dismissal from the football team.

Plaintiffs argue that Defendants are not entitled to summary judgment because there is an issue of fact regarding whether the petition substantially disrupted the team. In support of this argument, Plaintiffs point to their claim that the petition did not in fact disrupt the team. However, this argument misapplies the *Tinker* standard: *Tinker* does not require school officials to wait until the horse has left the barn before closing the door. Nor does *Tinker* "require certainty that disruption will occur." *Pinard*, 467 F.3d at 767.

This principle is illustrated in the Ninth Circuit case *Lavine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001). A high school student handed in a poem depicting, in the first person, a shooting massacre at the school. The student had previous disciplinary problems, and had told a school counselor his thoughts about suicide. The school contacted the police department and a psychiatrist from the Community Mental Health Crisis Line. A deputy sheriff went to the student's home to evaluate him. The student told the deputy that "he had no access to weapons and had no intention of carrying out any of the acts in the poem." *Id.* at 985. The student's mother assured the deputy that the student "had no access to weapons and was not a danger to himself or others." *Id.* The deputy concluded that there was no probable cause to have the student involuntarily committed for psychological evaluation, and reported his observations to the psychiatrist.

Based on his conversations with the deputy and school officials, the psychiatrist concluded that, in his professional opinion, "there were insufficient grounds for anyone to make a determination that [the student] was in imminent danger of causing serious harm to himself or others." *Id.* Accordingly, the psychiatrist concurred with the deputy's decision to not commit the student. However, after meeting and discussing the situation, school officials decided to order the emergency expulsion of the student. The student subsequently filed suit.

The district court denied the school's motion for summary judgment on the issue of whether the emergency expulsion violated the student's First Amendment rights. On appeal, the Ninth Circuit reversed. The Ninth Circuit noted that:

> In retrospect, it may appear that, as [the student's] mother predicted, the school overreacted. [The student] very well may have been using his poetry to explore the disturbing topic of school violence and chose to do so through the perspective of a suicidal mass murderer. In fact, [the student] strongly contends this was all he was doing and that he had no intention of hurting himself or others.

*Id.* at 991. However, the Ninth Circuit also noted that schools have a duty to prevent disturbances, and "forecasting disruption is unmistakably difficult to do." *Id.* at 989. The Ninth Circuit further noted that "*Tinker* does not require certainty that disruption will occur," and held that based on the circumstances, it was reasonable for school officials "to forecast a substantial disruption of or material interference with school activities." *Id.* at 989, 992.

The circumstances in *Lavine* were far graver than those in the instant case. However, *Lavine* is relevant because it demonstrates the proper application of the *Tinker* standard. If *Tinker* required certainty that disruption would occur, the school in *Lavine* would not have been entitled to summary judgment, as a deputy and psychiatrist concluded that there were insufficient grounds to determine that the student posed a threat to himself or others. However, *Tinker* does not require certainty, only

that the forecast of substantial disruption be reasonable. Thus, Plaintiffs' self-serving claim that the petition did not substantially disrupt the team does not preclude a grant of summary judgment for Defendants.

Plaintiffs argue that the Court may not rely on Defendants' self-serving claims. However, this argument again misunderstands the *Tinker* standard. This case does not hinge on a "he said/she said" conflict, because *Tinker* does not require disruption to have actually occurred. Thus, the Court need not choose between dueling sets of self-serving statements regarding the existence of disruption. Rather, the Court must evaluate the circumstances to determine if Defendants' forecast of substantial disruption was reasonable. This principle is further illustrated in this Court's recent decision in *D.B. v. Lafon*, No. 06-5982, 2007 U.S. App. LEXIS 3886 (6th Cir. 2007). The plaintiffs brought suit after they were prohibited from wearing clothing depicting the Confederate flag to school. The district court denied the plaintiffs' motion for a preliminary injunction, finding that they could not demonstrate a likelihood of success on the merits. On appeal, the plaintiffs argued that the district court erred in focusing on the *potential* for disruption. *Id.* at *10. However, this Court noted a history of racial tension at the school, and held that:

> Even assuming that no students' wearing of that symbol had caused a disruptive incident in the past, the district court nonetheless reasonably could conclude that displays of the Confederate flag would be likely to lead to unrest in the future. Such a determination is not erroneous as either a factual finding or a *legal conclusion*.

*Id.* at *12-13 (emphasis added). This Court also noted that although a brawl had not broken out over the flag, the school was not obligated to sit and wait for one before acting. *Id.* at 17 (citing *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000)).

Likewise, Defendants in the instant case were not obligated to wait until the petition substantially disrupted the team before acting, nor are they now required to demonstrate that it was certain that the petition would substantially disrupt the team. Rather, Defendants must show that it was reasonable for them to forecast that the petition would disrupt the team.

A member of the Jefferson County football team testified that a situation where players said they hated the coach and didn't want to play for him would have a substantially negative effect on a football team. Statements of that sort harm team unity, by dividing teammates into groups who support the coach and groups who don't. JA at 686. Assistant Coach Brimer also testified that a group of players saying they hated the coach could definitely break apart a team. JA at 640.

Plaintiffs argue that the petition was not disruptive because they did not intend to present it to school officials until after the football season. However, Plaintiffs were circulating the petition amongst the team during the season; it is unrealistic to claim that there was no effect on the team simply because Plaintiffs intended to delay the presentation of the petition. Furthermore, the petition did in fact "become public" before the end of the season, and to argue that the coaches were prohibited from taking action because Plaintiffs did not intend them to know about it is to ignore the realities of the situation. The petition was admittedly part of a campaign to have Euverard fired, and he was not required to wait until the campaign was complete before acting.

Plaintiffs also argue that Defendants' fears regarding unity are too generalized to support a forecast that the petition would disrupt the team, and that they must provide more specific evidence. This argument is unpersuasive; abstract concepts like team morale and unity are not susceptible to quantifiable measurement, yet they undeniably have a large impact on a team.

The impracticality of the standard Plaintiffs are calling for is demonstrated through the following examples. Consider the scene from *Hoosiers* described above. Clearly, a player giving "lip" to a coach during practice is reasonably likely to disrupt a team. But how would a coach be

able to "prove" this?  One suggestion would be to poll the team.  However, this would be unworkable, as it would effectively place the coach's ability to discipline his players in the hands of the players themselves.  This would be akin to "putting the inmates in charge of the asylum."  By deciding amongst themselves that disrespectful and insubordinate actions are not disruptive to the team, the players could hamstring the coach's ability to maintain order and discipline.

As another example, suppose that a student was given a detention after making a smart aleck remark to a teacher.  It is difficult to see how the teacher could "prove" that this one particular incident substantially disrupted the school.  However, the incident would clearly negatively affect the school's overall ability to maintain order and discipline.

In both of the above examples, the students would be unable to succeed with their First Amendment claims, despite the school officials' likely inability to offer any "proof" beyond common-sense conclusions based on human experience.  The Supreme Court recently noted that some common-sense conclusions do not require substantial evidentiary support:

> We need no empirical data to credit TSSAA's common-sense conclusion that hard-sell tactics directed at middle school students could lead to exploitation, distort competition between high school teams, and foster an environment in which athletics are prized more highly than academics.

*Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, __ U.S. __, 127 S. Ct. 2489, 2495-96 (2007). Similar common-sense conclusions support the determination, in the instant case, that Plaintiffs' petition was reasonably likely to cause substantial disruption on the Jefferson County football team.

The success of an athletic team in large part depends on its coach.  The coach determines the strategies and plays, and "sets the tone" for the team.  The coach, particularly at the high school level, is also responsible for providing "an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team."  *Wildman*, 249 F.3d at 771.  The ability of the coach to lead is inextricably linked to his ability to maintain order and discipline.  Thus, attacking the authority of the coach necessarily undermines his ability to lead the team.  In the instant case, Plaintiff Spurlock admitted that signing the petition was equivalent to saying he had no respect for Euverard.  JA at 569.  As the Eighth Circuit noted in *Wildman*, coaches are entitled to respect from their players. *Wildman*, 249 F.3d at 772.  Plaintiffs' circulation of a petition stating "I hate Coach Euvard [sic] and I don't want to play for him" was a direct challenge to Euverard's authority, and undermined his ability to lead the team.  It could have no other effect.

In addition to challenging Euverard's authority, the petition threatened team unity.  In most instances, school officials would be more likely to fire a coach who had a horrible season than one who had a successful season.  Thus, players advocating the removal of a coach would have a powerful incentive to give less than one hundred percent.  The Court is not accusing Plaintiffs of this behavior; Plaintiffs all claim to have played their hardest despite their feelings for Euverard.  However, after every missed block, dropped pass, or blown tackle, it would only be natural for other players, knowing the situation, to question Plaintiffs' motivation.[2]  This would inevitably increase the tension on the team.

---

[2]The infamous Chicago "Black Sox," who threw the 1919 World Series, were motivated in part by their dislike of the team's owner, Charles Comiskey.  *See* ELIOT ASINOF, EIGHT MEN OUT (1963).  When Coach Byron Scott was fired by the New Jersey Nets in January of 2004, there was widespread speculation that his players had mutinied against him. *See* Mark Heisler, *Desperate Times for Desperate Teams*, L.A. TIMES, Feb. 12, 2006, at D5.

The circulation of the petition necessarily divided players into two camps, those who supported Euverard and those who didn't. Although team chemistry is impossible to quantitatively measure, it is instrumental in determining a team's success. Joakim Noah, a player on the University of Florida basketball team that won consecutive NCAA championships in 2006 and 2007, stated that "the difference between winning and losing is so, so small. . . . It's teams that really play together that win. Team chemistry is such a sensitive thing, but we really, really have it." Paola Boivin, *Gators Bare Their Championship Teeth*, ARIZONA REPUBLIC, Mar. 19, 2007, at 11.

Mutual respect for the coach is an important ingredient of team chemistry. The Detroit Tigers were the talk of the baseball world during the 2006 season, due to their remarkable turnaround and run to the World Series. An opposing player attributed the Tigers' success to "a manager they all trust and respect and that they are behind, and a team chemistry that seems pretty unified." John Lowe, *Add in Some Hot Bats, and the Tigers Have Found Their Swagger*, DETROIT FREE PRESS, Oct. 16, 2006, at 5. *See also* Mark Gaughan, *Expectations Low in an Uncertain Era*, BUFFALO NEWS, Sep. 7, 2006, at C11 ("I truly believe there is team chemistry. I believe the players truly believe and respect Coach Jauron."); David Boyce, *Central Missouri State Working for Series Title*, KANSAS CITY STAR, May 10, 2002, at D8 ("We have a deep respect for our coaches . . . We know they know what they are doing. We have a good team chemistry.").

Conversely, conflict between a player and the coach can shake "the very foundation of team chemistry." Greg Boeck, *Revolution on Court: Players' Defiance Upsets NBA Leadership Picture*, USA TODAY, Dec. 21, 2000, at C1. One sportswriter has noted that:

> The feud between [the player and coach] ultimately tore at the fabric of team chemistry and may have contributed to [the team's] postseason failure. At best, the constant discord created an uncomfortable atmosphere on the team. *At worst, it forced players to choose between a coach and a teammate, creating a fissure of distrust and disunity.*

Glenn Nelson, *Ready to Blow? Enigmatic George Karl Can't Understand Why He's Misunderstood*, SEATTLE TIME, Nov. 1, 1995, at H3 (emphasis added). Conflict between a player and coach has also been described as a "cancer." Selena Roberts, *From Sleepless to Selfless*, NEW YORK TIMES, Dec. 10, 1996, at B13.[3]

The Court does not have an idealized, pristine view of athletic teams. Athletic teams are a family of sorts, and, like any family, it is inevitable that there will be some squabbles. Games are emotional affairs, and players and coaches may exchange angry words in the heat of the moment. From time to time, players may also vent their frustrations over play calls, lack of playing time, etc. The petition in this case, however, cannot be characterized as an isolated expression of dissatisfaction. The petition, stating "I hate Coach Euvard [sic] and I don't want to play for him" was part of a concerted effort to have Euverard fired. Such a petition would necessarily force players to choose between Euverard and the players that opposed him.

School officials have a duty to prevent disturbances. *Lavine*, 257 F.3d at 289. In the context of school athletics, this duty consists of providing "an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team." *Wildman*, 249 F.3d at 771. Plaintiffs suggest that the initial meeting where Euverard questioned the players about the petition was itself a constitutional violation. This argument is without merit; it is based on the mistaken premise that *Tinker* requires actual disruption to occur before school officials may act. Under Plaintiffs' theory, school officials

---

[3]*See also* Lacy J. Banks, *Wilkins, NBA Coaches Deserve More Backing*, CHICAGO SUN-TIMES, Apr. 26, 2000.

would be between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation. Such a rule is not required by *Tinker*, and would be disastrous public policy: requiring school officials to wait until disruption actually occurred before investigating would cripple the officials' ability to maintain order.

School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place. For Euverard and the other coaches to have turned a blind eye to a potential threat to team unity would have been a grave disservice to the other players on the team. It was therefore appropriate for the coaches to hold a meeting with the players regarding the petition. Plaintiffs Lowery, Giles, and Dooley do not dispute that they were insubordinate at the meeting, and Dooley admitted saying "I know how much you hate him, and you guys need to leave with us right now" to the other players. JA at 673.

"Forecasting disruption is unmistakably difficult to do"; thus, "*Tinker* does not require certainty that disruption will occur." *Lavine*, 257 F.3d at 989. Based on the circumstances, it was reasonable for Defendants to believe that the petition would disrupt the team, by eroding Euverard's authority and dividing players into opposing camps. This belief was bolstered by Plaintiffs' insubordinate and disruptive acts at the team meeting.[4] Thus, the petition was not protected by *Tinker*, and Defendants did not violate Plaintiffs' First Amendment rights by removing them from the football team. Because there was no constitutional violation, it is not the Court's place to approve or disapprove of Euverard's actions.

This conclusion is supported by the analogous reasoning of the Supreme Court in *Connick v. Myers*, 461 U.S. 138 (1983). We recognize that *Connick* was decided in the context of government employment, using the standard laid down in *Pickering v. Board of Educ.*, 391 U.S. 563 (1968). Cases involving government employees are generally inapplicable to cases involving students. However, student athletes have greater similarities to government employees than the general student body. As discussed above, it is well-established that participation in athletics is not a constitutional right, and student athletes are subject to greater restrictions than the student body at large. The Supreme Court has noted that:

> By choosing to "go out for the team," [student athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. . . . Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy.

*Vernonia*, 515 U.S. at 657 (quotation omitted).

There is a crucial distinction between the government regulating the citizenry in its sovereign capacity, and managing programs that citizens participate in voluntarily. "It is a long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, . . . but, rather, as proprietor, to manage [its] internal operation[s] . . . .'" *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)). *See also Brentwood*, 127 S. Ct. at 2495 ("Just as the government's interest in running an effective workplace can in some circumstances outweigh employee speech rights . . . so too can an athletic league's interest in enforcing its rules sometimes warrant curtailing the speech of its voluntary participants."); *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion) (The government has "a freer hand in regulating the speech of its employees than it has in

---

[4]Plaintiff Spurlock was not present at the initial meeting. As described above, Spurlock met with Euverard the following day, where he reiterated his desire to not play for Euverard.

regulating the speech of the public at large."); *Rust v. Sullivan*, 500 U.S. 173 (1991) (The government, when managing a voluntary program, can regulate conduct, including speech, that is germane to the purpose of the program.).

Similarly, there is a difference between the way a school relates to the student body at large, and to students who voluntarily "go out" for athletic teams. This Court has specifically recognized the distinction between the role of a teacher and a coach. *Dambrot*, 55 F.3d at 1190. Restrictions that would be inappropriate for the student body at large may be appropriate in the context of voluntary athletic programs. The greater restrictions on student athletes are analogous to the greater restrictions on government employees; thus, legal principles from the government employment context are relevant to the instant case.

In *Connick*, the plaintiff, an assistant district attorney, was informed that she would be transferred to another section. The plaintiff opposed the transfer, and expressed her objections to her supervisor, Connick. When her objections failed to avert the transfer, she "prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressure to work in political campaigns." *Connick*, 461 U.S. at 141. Connick terminated the plaintiff after learning of the questionnaire. The plaintiff subsequently brought suit, claiming that her First Amendment rights were violated.

The Supreme Court noted that:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 149. The Supreme Court also noted that:

> [The plaintiff] did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did [the plaintiff] seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of [the plaintiff's] questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.

*Id.* at 148.

The Supreme Court did hold, however, that part of the questionnaire addressed a matter of public concern: whether employees were pressured to work on political campaigns. The Supreme Court then proceeded to analyze the effect the questionnaire had on the office, and held that:

> [I]t requires no unusual insight to conclude that the purpose, if not the likely result, of the questionnaire is to seek to precipitate a vote of no confidence in Connick and his supervisors. Thus, Question 10, which asked whether or not the Assistants had confidence in and relied on the word of five named supervisors, is a statement that carries the clear potential for undermining office relations.

*Id.* at 152. The Supreme Court further held that it was not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* Finally, the Supreme Court held that "[t]he limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. [The plaintiff's] discharge therefore did not offend the First Amendment." *Id.* at 154.

We find a segment of the *Connick* reasoning to be analogous to the instant case. Specifically, the Supreme Court considered it self-evident that the questionnaire had "the clear potential for undermining office relations." *Id.* at 152. Thus, Connick could reasonably believe that the questionnaire would "disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at 154.[5]

We note that the challenge to Connick's authority was far more oblique than Plaintiffs' challenge to Euverard's authority. The purpose of the Connick questionnaire was to lay the groundwork for a no-confidence vote, but the questionnaire itself did not challenge Connick. In contrast, the petition in the instant case contained (in fact, entirely consisted of) a direct attack on Euverard, and was part of an outright attempt to have him fired. The Supreme Court recognized that employers are not constitutionally required to tolerate threats, even if indirect, to their authority. The Supreme Court found it axiomatic that such threats had "the clear potential for undermining office relations." *Id.* at 152.

If employers are not required to tolerate indirect threats, they are clearly not required to tolerate outright attempts to have them fired. High school football coaches, as well as government employers, have a need to maintain order and discipline. Requiring coaches to tolerate attacks on their authority would effectively strip them of their ability to lead. It would also do a great disservice to other players who wish to play on a team free from strife and disunity; a team cannot function as a unit with groups of players and the coach pulling in opposite directions.

The key to understanding *Connick* and the instant case is that neither case is fundamentally about the right to express one's opinion, but rather the ability of the government to set restrictions on voluntary programs it administers. The distinction is subtle, but important. The First Amendment prevents the state from using its coercive power to prevent people from expressing their opinions. However, managers of government programs necessarily exercise a degree of control over those programs, and the First Amendment does not guarantee that there will be no losers in intra-office politics. The plaintiff in *Connick* engaged in intra-office politicking to reverse a management decision she disagreed with. Her efforts were unsuccessful, and she was terminated. The plaintiff had a right to criticize her supervisor; the state could not throw her in jail or deport her for her actions. However, the plaintiff did not have a right to continue working for the supervisor whose authority she challenged.

Likewise, Plaintiffs had, and have, a right to express their opinions about Euverard. Plaintiffs engaged in the equivalent of intra-office politicking to have Euverard fired. The message that Plaintiffs intended to deliver to the administration was essentially "either he goes or we go." This is not an uncommon situation in sports; owners sometimes have to choose between the players

---

[5]We respectfully disagree with Judge Gilman's assertion that we are grafting a public-concern requirement onto *Tinker*. Our holding in no way rests on a determination of whether Plaintiffs' speech touched on a matter of public or private concern. *Tinker* cases must be evaluated in the context in which they occur, and for the reasons stated above students who participate in voluntary athletic programs bear some similarities to government employees. We cite to *Connick* for the proposition that it is reasonable to forecast that disruption will occur when a subordinate challenges the authority of his or her superior.

and the coach.**6**  Unfortunately for Plaintiffs, the administration backed Euverard.  Plaintiffs, in a sense, got what they desired: they are no longer playing for a coach they admittedly did not want to play for.

Of course, the school could not, and did not, suspend them for their opinions.  Plaintiffs' ability to attend class has not been threatened.  As this Court has noted, "[t]he main purpose of high school is to learn science, the liberal arts and vocational studies, not to play football and basketball." *Crocker*, 980 F.2d at 387.  Part of the Eighth Circuit's reasoning in *Wildman* is also particularly relevant to this situation: "The school did not interfere with Wildman's regular education. A difference exists between being in the classroom, which was not affected here, and playing on an athletic team when the requirement is that the player only apologize to her teammates and her coach for circulating an insubordinate letter." *Wildman*, 249 F.3d at 772.**7**  Plaintiffs' regular education has not been impeded, and, significantly, *they are free to continue their campaign to have Euverard fired*.  What they are *not* free to do is continue to play football for him while actively working to undermine his authority.

Confusing the right to express one's opinion with the right to participate in a voluntary government program on one's own terms would lead to an unworkable legal regime.  For example, suppose an applicant for a government job told the interviewer that he hated her and did not want to work for her, and was subsequently not hired for the position based on his attitude.  If the issue is framed as solely dealing with the applicant's right to express his opinion, he would be able to successfully bring a claim for viewpoint discrimination.  That would be an absurd result, and fortunately the First Amendment does not require it.  Likewise, if a group of students tried out for a football team and some students told the coach that they hated him and did not want to play for him, while others said that they respected him and wanted to play for him, the coach could select the players with positive attitudes without violating the First Amendment.

As the Supreme Court has noted, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. *Connick*, 461 U.S. at 149.  Nor does it require high school football teams to be run in that fashion.  When players voluntarily "go out" for a team they implicitly agree to accept the coach's authority.  When the government manages a voluntary program it may restrict conduct, including speech, that threatens the purpose of the program.

Of course, players do not completely waive their rights when they join a team: a coach could not dismiss a player simply because the player had religious or political views that were unpopular with his teammates.  Nothing of the sort happened in the instant case.  Nor was this a whistleblower situation, where players were disciplined for reporting improprieties.  Plaintiffs participated in a petition stating "I hate Coach Euvard [sic], and I don't want to play for him," with the avowed intention of having Euverard fired.  A consistent theme running throughout *Tinker* and its progeny is that the First Amendment rights of students are more limited than those of adults.  Clearly, the Supreme Court would reject out of hand the argument that a government employee has a First Amendment right to attempt to have his or her employer fired.  It would make little sense, legal or otherwise, to confer an analogous right upon high school student athletes.

It was reasonable for Defendants to forecast that Plaintiffs' petition would undermine Euverard's authority and sow disunity on the football team.  Thus, there was no constitutional

---

**6***See* Mike Preston, *Billick's Message Has Grown Stale, so Ravens Need a Fresh Approach*, BALTIMORE SUN, Dec. 5, 2005, at E3.

**7**The Court notes that Jefferson County football players who signed the petition but apologized to Euverard and told him they wanted to play for him were allowed to remain on the team.

violation in Plaintiffs' dismissal from the team. *Tinker* does not require teachers to surrender control of the classroom to students, and it does not require coaches to surrender control of the team to players.

### III.  CONCLUSION

For the above reasons, we **REVERSE** the district court's denial of summary judgment and remand the case for entry of summary judgment in favor of Defendants.

---

### CONCURRING IN THE JUDGMENT

---

RONALD LEE GILMAN, Circuit Judge, concurring in the judgment.  Contrary to the analysis in the lead opinion, I believe that the writing in question constitutes protected speech under *Tinker* and that the defendants have failed to carry their burden of "demonstrat[ing] any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.").  The student-athletes in the present case, in my opinion, have thus properly asserted a constitutional violation.

But what I find most troubling about the lead opinion's analysis is that it significantly alters First Amendment jurisprudence by grafting the public-concern requirement of *Connick v. Myers*, 461 U.S. 138 (1983), onto the *Tinker* test, an approach never before taken in student-speech cases by either the Supreme Court or any other federal court of appeals to consider the issue.  Moreover, the Supreme Court recently had an opportunity to overrule or otherwise alter *Tinker*, but explicitly declined to do so in a way that would affect the outcome of the present case.  *See Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (holding that "a [high school] principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use").  I nonetheless concur in the judgment because I believe that the First Amendment right as applied to the particular circumstances in this case was not so clearly established at the time of the alleged violation as to deprive the defendants of qualified immunity.

### I.          The lead opinion's application of *Connick* in a student-speech case is unprecedented

Although the lead opinion purports to apply *Tinker*, what it actually applies is the public-concern test announced by the Supreme Court in *Connick*.  The Ninth Circuit rejected this very approach in *Pinard v. Clatskanie School District 6J*, 467 F.3d 755 (9th Cir. 2006), and I do not think that we should consider it here.  *See Pinard*, 467 F.3d at 766 ("Although *Connick*'s personal matter/public concern distinction is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither we, the Supreme Court nor any other federal court of appeals has held such a distinction applicable in student speech cases, and we decline to do so here.").  I see no justification for grafting this requirement onto *Tinker* in the absence of Supreme Court caselaw instructing us to do so.  *Tinker* has been in force for several decades now, and the Supreme Court's recent holding in *Morse* does nothing to undercut its application to the facts of the present case.

The lead opinion states that "[t]he key to understanding *Connick* and the instant case is that neither case is fundamentally about the right to express one's opinion, but rather the ability of the government to set restrictions on voluntary programs it administers." Lead Op. at 14.  It goes on to state that "the First Amendment does not guarantee that there will be no losers in intra-office politics." *Id.*  That may be true as a general proposition, but the fact remains that government employees and high school athletes are not similarly situated, despite the lead opinion's analysis to the contrary.  Whether we think that "student athletes have greater similarities to government employees than the general student body," Lead Op. at 12, is not determinative.  What *is* determinative is that they are not similarly situated under existing caselaw.  Furthermore, the Supreme Court has specifically given us one test for students and another test for public employees.

Applying *Connick* to the present case seems especially inappropriate given the Supreme Court's recent decision in *Morse*. In *Morse*, a high school senior unfurled a banner bearing the phrase "BONG HiTS 4 JESUS" across the street from his school while watching the Olympic Torch Relay pass through town. *Morse*, 127 S. Ct. at 2622. The viewing of the relay was a school-sanctioned event. *Id*. Because the principal thought that the banner promoted illegal drug use, she asked the student to take it down, but the student refused. *Id*. The student was suspended as a result, and he subsequently sued the school, alleging that the school had violated his First Amendment rights. *Id*. at 2623.

*Morse* gave the Supreme Court an opportunity to revisit *Tinker* and, had Justice Thomas's view carried the day, to overrule it. *See Morse*, 127 S. Ct. at 2630 (Thomas, J., concurring) (writing separately to state his "view that the standard set forth in [*Tinker*] is without basis in the Constitution"). But the majority did not go that far, confirming only that "the rule of *Tinker* is not the only basis for restricting student speech." *Id*. at 2627. The Court's holding was a narrow one—namely, that "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id*. at 2622. And in reaching this holding, the Court emphasized the "important—indeed, perhaps compelling" interest in deterring drug use among schoolchildren. *Id*. at 2628.

Given the facts of *Morse*, the Supreme Court could well have chosen to add a public-concern requirement to the traditional *Tinker* analysis, but it did not do so. The school superintendent's administrative decision in *Morse* highlighted the fact that the student's speech was not political or espousing a religious viewpoint, but instead was "a fairly silly message promoting illegal drug usage in the midst of a school activity." *Id*. at 2623. But the Court did not depend on this fact in its analysis. Nor did it undercut the force of *Tinker* in a way that has application to the facts of the present case. Justice Alito's concurrence suggests just the opposite. *See id.* at 2638 (Alito, J., concurring) (writing separately to emphasize the special dangers of illegal drug use as grounds for greater regulation of student speech, but joining the majority opinion only "with the understanding that the opinion does not endorse any further extension" of speech restrictions in public schools).

Vague notions of "teamwork" and "unity" are simply not compelling school interests in the way that the prevention of illegal drug use is. Nothing in *Morse* suggests that anything other than a standard *Tinker* analysis is appropriate in the present case, and Justice Alito's concurrence explicitly suggests otherwise. *See id.* ("But I do not read the opinion to mean that there are necessarily any grounds for such regulation that are not already recognized in the holdings of this Court."). I therefore would not alter First Amendment jurisprudence in the way that the lead opinion does.

## II.    The school has not met its burden under *Tinker*

To be sure, students do not have a general constitutional right to participate in extracurricular activities. Lead Op. at 5. But that is not the issue here. Neither is whether "conflict between a player and the coach can shake 'the very foundation of team chemistry,'" Lead Op. at 11, nor whether "coaches are entitled to respect from their players," Lead Op. at 10. Although both of these statements might well be true, neither presents a legal question. The issue in the present case is whether, under *Tinker*, the students' petition was protected speech. If it was, then the coach would have been within his rights to kick them off the team if, and only if, the school had "demonstrate[d] any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514; *Pinard*, 467 F.3d at 768 (stating that, under *Tinker*, "the defendants must justify their decision to suspend the players permanently" by showing such facts).

The lead opinion is undeniably correct in stating that the school is not required to wait for an actual disruption before acting, nor must the school be certain that a disruption would occur. Lead Op. at 9. It gives lip service to the correct standard under *Tinker*—that the forecast of substantial disruption be reasonable—but then fails to apply the standard correctly. Instead, it improperly places the burden on the students to prove that there would not have been a disruption. This is simply not the test articulated in *Tinker*. The school bears the burden of demonstrating sufficient facts to support its forecast of substantial disruption. *See id.* at 514. It has not done so here.

Nor do I see in the record any claim by the defendants that the petition was disruptive in and of itself. What the record *does* contain is one player's opinion that "a situation where players said they hated the coach and didn't want to play for him would have a substantially negative effect on a football team," and an assistant coach who testified that, in his opinion, "a group of players saying they hated the coach could definitely break apart a team." Lead Op. at 9. At most, the defendants have asserted a generalized fear of disruption to team unity based on the students' critical opinion of Euverard's ability as a coach. This is simply not enough to meet the "substantial disruption" standard of *Tinker*. *See Tinker*, 393 U.S. at 511 ("[S]chool officials cannot suppress expressions of feelings with which they do not wish to contend.") (quotation marks omitted); *Seamons v. Snow*, 206 F.3d 1021, 1030 (10th Cir. 2000) ("[C]oaches may not penalize players for engaging in peaceful speech activity which does not create substantial disorder, materially disrupt class work, or invade the rights of others.").

Moreover, a review of the record shows that there was no possibility of disruption or interference, nor did the players intend that there be one, until Euverard found out about the petition, became upset, and decided to "smoke out" the culprits and dismiss them from the team. There are no facts in the record suggesting that any disruption could have been reasonably forecast. The plaintiffs had no intention of quitting the team and were not otherwise "problem" players. Euverard did not even find out about the petition until one of the other players, who is not a party in this case, informed one of the assistant coaches.

### III.        The Ninth Circuit's analysis in *Pinard* is persuasive

In my view, the facts of the present case are closer to those in *Pinard v. Clatskanie School District 6J*, 467 F.3d 755 (9th Cir. 2006), than to those in *Wildman ex rel. Wildman v. Marshalltown School District*, 249 F.3d 768 (8th Cir. 2001), the latter case being the one relied upon by the lead opinion. Moreover, I believe that *Pinard* persuasively explains why the lead opinion's reliance on *Connick* is misplaced.

The lead opinion argues that the "crucial distinction" distinguishing *Pinard* from the present case is that "the coach in *Pinard* voluntarily put his authority into play, so to speak" by telling the players that if they wanted him to quit, that he would do so. Lead Op. at 8. I disagree that *Pinard* can be so easily distinguished on this basis. The Ninth Circuit certainly did not rely on this point in concluding that the petition was protected under the First Amendment. *Pinard*, 467 F.3d at 768-69. As in the present case, the *Pinard* plaintiffs alleged that the coach had engaged in abusive and intimidating behavior toward the players. *Id.* at 760. The players, after a team meeting where the coach "told the players that if they wanted him to quit, they should say so, and he would resign," signed a typewritten petition asking the coach to resign. *Id.* All players but one (the coach's son) signed the petition. *Id.* at 761.

Arguably the petition in *Pinard* exhibited even greater insubordination than the one in the present case, because the cocaptains of the team in that case presented the petition directly to the coach himself in the middle of the season. *Id.* at 761. In contrast, Lowery and the other students here had no intention of presenting the petition until after the football season had ended. Nor did

any of the students themselves actually present the petition to any teacher or coach. For purposes of summary judgment, we must consider these facts in the light most favorable to Lowery and his fellow plaintiffs. *See Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 930 (6th Cir. 2005) (noting, in reviewing a district court's grant of summary judgment, that "[w]e must also consider all facts in the light most favorable to the non-movant and must give the non-movant the benefit of every reasonable inference") (quotation marks omitted).

I further disagree with the lead opinion's reliance on *Wildman*. The *Wildman* court cited the governing standard both from *Tinker* and from *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), the latter governing vulgar, lewd, obscene, or plainly offensive speech. A review of the *Wildman* opinion does not reveal which standard the Eighth Circuit used in its analysis. What it does reveal is that the court there focused on the alleged insubordinate nature of the speech, coupled with the conclusory statement that "coaches deserve a modicum of respect from athletes, particularly in an academic setting." *Wildman*, 249 F.3d at 772. It also implied that had Wildman's speech been on a more important topic, that it may have been protected under either framework. *See id.* ("Here, in an athletic context [de]void of the egregious conduct which spurred the football player's speech about the hazing incident in *Seamons* [*v. Snow*, 206 F.3d 1021 (10th Cir. 2000)], and where Wildman's speech called for an apology, no basis exists for a claim of a violation of free speech.").

The problem with the Eighth Circuit's analysis as applied to the present case is that it improperly makes a value judgment on the speech itself, something that is not part of the *Tinker* analysis. As the plaintiffs here correctly point out, viewpoint discrimination is simply not tolerated under *Tinker*. But this is precisely the effect of the lead opinion's statement that "a coach could not dismiss a player simply because the player had religious or political views that were unpopular with teammates." Lead Op. at 30. In a pure speech case such as the present one, such a value judgment is inappropriate in the absence of extenuating circumstances, such as a school's commitment to combating illegal drug use. *See Tinker*, 393 U.S. at 505-06 (noting that the Supreme Court has repeatedly held that "pure speech . . . is entitled to comprehensive protection under the First Amendment") (quotation marks omitted); *Morse,* 2007 WL 1804317, at *11 (holding that the "First Amendment does not require schools to tolerate at school events student expression" that could be reasonably construed as promoting illegal drug use, but emphasizing the holding as inextricably entwined with the school's policy against drug use).

There is no disputing the fact that "student athletes are subject to more restrictions than the student body at large." Lead Op. at 5 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995)). And "[b]y choosing to 'go out for the team,' [student-athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id*. at 657. At the same time, however, a student-athlete does not, as suggested by the lead opinion, enjoy fewer First Amendment rights under *Tinker* because of his or her choice to participate in high school athletics. Lead Op. at 5-6. The examples given by the Court in *Vernonia* of increased regulation over student-athletes—submitting to a preseason physical exam, acquiring adequate insurance coverage, signing an insurance waiver, maintaining a minimum grade point average, and complying with rules of conduct, dress, or training hours, *Vernonia*, 515 U.S. at 567—do not support a similar restriction on free-speech rights.

In sum, we need look no further than the now-famous language from *Tinker* to guide the analysis in this case:

> A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, *or on the playing field*, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school . . . .

*Tinker*, 393 U.S. at 512-13 (emphasis added) (parentheses and quotation marks omitted). The football players in this case expressed their opinion about their coach by signing a petition. At least half of the team signed it. Nothing else happened until Euverard found out, became upset, and retaliated against the instigators who dared to question his abilities as a coach. For the reasons explained above, I think that this case bears remarkable similarity to *Pinard* and that there was a violation of the student-athletes' First Amendment rights under *Tinker*.

## IV. Qualified immunity

A finding of a constitutional violation, however, is but the first step in the qualified-immunity analysis. As the lead opinion explains, that right must also be clearly established at the time of the violation. Lead Op. at 3. "A right is 'clearly established' for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been held unlawful." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006). Preexisting law need not, however, "address the very question at hand." *Logsdon v. Hains*, — F.3d —, 2007 WL 1946851, at *6 (6th Cir. July 6, 2007). The relevant inquiry in this case is whether Euverard should have clearly realized "that his conduct was unlawful in the situation he confronted." *See Smoak*, 460 F.3d at 768.

*Tinker*, of course, has been the law since 1969, protecting the general right of students to exercise free speech while in school. There is no caselaw in this circuit, however, applying *Tinker* to student-athletes and defining the contours of their First Amendment rights. For this reason, I do not believe that the contours of the right were sufficiently clear to put Euverard on notice that his action in response to the petition was a violation of the First Amendment. *See Seal v. Morgan*, 229 F.3d 567, 581 (6th Cir. 2000) (holding that a school superintendent was entitled to qualified immunity where the contours of the constitutional right were not "sufficiently clear to put a reasonable school superintendent on notice in 1996 that a school disciplinary policy's lack of a conscious-possession[-of-a-weapon] requirement could produce irrational expulsions and thus violate the legal rights of students expelled under the policy").

The plaintiffs, moreover, have presented nothing to overcome their burden of showing that Euverard should be denied qualified immunity. *See Smoak*, 460 F.3d at 778 ("Throughout the analysis, the burden is on the [plaintiffs] to show that the defendants are not entitled to qualified immunity."). I therefore concur in the judgment, despite what I believe is the lead opinion's erroneous refusal to recognize the constitutional right at issue.